IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

SHAFIQULLAH KOSHANI,         )
         )
      Plaintiff,         )
         )
v.         )         No. 3:17-CV-265
         )
ERIC WAYNE BARTON, and         )
VANQUISH WORLDWIDE, L.L.C.,         )
         )
      Defendants.         )

## <u>MEMORANDUM OPINION</u>

This civil action is before the court for consideration of Defendants' motion for

summary judgment. [Doc. 54]. Plaintiff has filed a response, and Defendants have

submitted a reply. [Docs. 64, 77]. For the reasons that follow, the motion will be denied.

## I.    Background

The plaintiff, Shafiqullah Koshani, a citizen and resident of Afghanistan, filed the

instant suit against defendants Eric Barton, a citizen of the United States, and Vanquish

Worldwide, LLC, alleging that he and Mr. Barton established a joint venture in

Afghanistan in 2010. [Doc. 41, ¶¶ 2, 7-8]. They documented the terms of their joint

venture in a Joint Venture Agreement ("JVA") [doc. 41-1], which entitled Plaintiff to

receive fifty-one percent of any net profits. [*Id.* at 2]. Plaintiff maintains that the parties

registered the joint venture with the Afghan government and procured a business license

from the Afghanistan Investment Support Agency ("AISA"); named their new business

Vanquish Worldwide ("Vanquish Afghanistan"); and pursued a contract with the United States Army, which was soliciting bids for a project known as "National Afghan Trucking," or "NAT," in Afghanistan. [Doc. 41 ¶¶ 2, 14, 20-21]. Plaintiff alleges that he "invested his own money in efforts to obtain and lay the groundwork for [securing] the NAT prime contract." [*Id*. ¶ 27].

Plaintiff alleges that Mr. Barton submitted a proposal to the United States in response to the NAT solicitation, but he did not submit it in Vanquish Afghanistan's name. [*Id*. ¶ 28]. Instead, Mr. Barton allegedly submitted the proposal on behalf of a company with a nearly identical name, Vanquish Worldwide, LLC ("Vanquish United States")—a company that he allegedly owned in Tennessee—and tabbed Vanquish Afghanistan as a subcontractor that would render services under the contract. [*Id*. ¶¶ 9, 29]. The United States ultimately awarded the NAT contract to Vanquish United States. [*Id*. ¶ 34].

Afterwards, Mr. Barton allegedly informed Plaintiff that he had secured the NAT contract on Vanquish United States' behalf, instead of on Vanquish Afghanistan's behalf, and asked plaintiff to agree to make Vanquish Afghanistan a subcontractor under the NAT contract. [*Id*. ¶ 35]. Plaintiff claims that he refused to do so because he had agreed to be Mr. Barton's partner, not his subcontractor, and he insisted that they proceed with the terms of the JVA. [*Id*. ¶¶ 35-36]. Plaintiff and Mr. Barton then entered into a Profit Sharing Agreement ("PSA") [doc. 41-2], in which Mr. Barton acknowledged that he had received plaintiff's "help[]" in building Vanquish Afghanistan and creating the proposal that the United States accepted. [*Id*. at 1]. In the PSA, the parties agreed that Plaintiff would be entitled to half of "Vanquish worldwide's" net profits from the NAT contract, though they

also expressed their simultaneous intention to proceed "as per our agreement." [*Id.*]. Plaintiff alleges that, in honoring this new agreement, he provided significant start-up capital to Vanquish United States so that it could perform its responsibilities under the NAT contract. [Doc. 41 ¶ 44].

According to Plaintiff, when the United States began making payments to Vanquish United States under the NAT contract, Mr. Barton initially allocated shares of those payments to him. [*Id.* ¶ 50]. However, by August 2012, Mr. Barton stopped providing Plaintiff with his share of the profits, and eventually cut Plaintiff out of the business altogether. [*Id.* ¶¶ 51-52]. Plaintiff estimates that the United States paid nearly $32 million to Vanquish United States under the NAT contract and that it received net profits under the contract that totaled at least $11 million. [*Id.* ¶¶ 57-58]. He believes that the PSA entitles him to half of these profits. [*Id.* ¶ 58].

To recover those profits, Plaintiff filed suit in this Court against Mr. Barton and Vanquish United States, bringing multiple claims, including breach of contract, breach of fiduciary duty, conversion, unjust enrichment, equitable accounting, breach of duty of care, breach of duty of loyalty, breach of duty of trust, usurpation of corporate opportunities, breach of the covenant of good faith and fair dealing, an accounting, and a request for punitive damages. [*Id.* at 13-26]. On a motion to dismiss, this Court dismissed a portion of Plaintiff's breach of contract claim, and his claim for an accounting. [Doc. 59 at 5-7, 16-17]. Defendants now seek summary judgment on all claims in the amended complaint. [Docs. 54; 54-1].

## II.        Standard of Review

Summary judgment is appropriate when the moving party shows that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323.  The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's case," at which point the non-moving party, to withstand summary judgment, must identify facts in the record that create a genuine issue of material fact.  *Id*. at 324-25.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it may affect the outcome of the case under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.  In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.  When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).  "[T]he judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Anderson*, 477 U.S. at 249.

## III.    Analysis

Defendants raise numerous arguments in support of their motion for summary judgment, ranging from contractual interpretation to the statute of limitations. The Court will address these arguments in the order that the Defendants have raised them in their memorandum supporting their motion for summary judgment.

### A.  Count One – Breach of JVA and PSA

#### a.  Merger Doctrine

Defendants' first argument in favor of summary judgment on Count One of the amended complaint is that, under the doctrine of merger, the JVA and PSA were superseded by a third agreement between the parties, the "Partnership Agreement," in which the parties incorporated their prior agreements. [Doc. 54-1 at 5-6]. Plaintiff contests whether the Partnership Agreement was a separate agreement, instead characterizing it as a collection of the parties' prior agreements into one place. [Doc. 64 at 3]. Plaintiff also contests whether the Partnership Agreement contained inconsistent terms, such that the doctrine of merger is applicable. [*Id*. at 5].

In construing a contract, a court's first task is to determine whether the contract's language is ambiguous. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). If the language is ambiguous, a court applies established rules of construction to determine the parties' intent. *Id*. A contract's terms are ambiguous if they are susceptible to more than one reasonable interpretation. *Id*.

Under the merger doctrine, when parties to a contract enter into a subsequent agreement concerning the same subject matter as the first contract, the earlier contract merges into the latter contract, and is rescinded and extinguished. *Shree Krishna, LLC v. Broadmoor Inv. Corp.*, No. W2011-00514-COA-R3-CV, 2012 WL 312254, at *14 (Tenn. Ct. App. Feb. 1, 2012). For the merger doctrine to apply, the successive contracts must have the same parties and generally must contain inconsistent terms, such that they cannot be considered supplemental agreements. *Id.* Inconsistency of terms is the crux of the merger doctrine inquiry. *Great American Ins. Co. v. Nelson, Inc.*, 276 F. Supp. 3d 762, 768 (W.D. Tenn. 2017).

The language of the Partnership Agreement does not speak to whether the agreement is a new agreement or a collection of agreements, therefore, the parties' intent is relevant. *See Planters Gin Co.*, 78 S.W.3d at 890. A genuine issue of material fact exists as to whether the parties intended the Partnership Agreement to be a new, third agreement, or whether the parties intended the Partnership Agreement to be a collection of their prior agreements. Although his testimony is somewhat unclear, in his deposition, Plaintiff indicated that the Partnership Agreement contained the JVA and PSA. [Doc. 55-2 at 3]. In his sworn declaration, Plaintiff stated that, after signing the PSA, he suggested that the parties prepare a collection of their agreements in one place, and file that with various authorities. [Doc. 65-1 at 5]. The parties then assembled, in both English and Dari, (a) the AISA Identification Form; (b) the partnership articles; (c) the JVA; (d) the PSA; and (e) an Electronic Funds Transfer form for the NAT contract. Plaintiff stated that the parties never

discussed the idea that this would be a new agreement, and instead, specifically agreed that it was a combination of all existing agreements. [*Id.*].

Moreover, a genuine issue of material fact exists as to whether the Partnership Agreement contains inconsistent terms, such that the merger doctrine applies. A comparison of the Partnership Agreement and the JVA indicates that the documents are substantially similar, although the phrase "joint venture" in the JVA has been replaced with "partnership" throughout the Partnership Agreement. [*Compare* Doc. 55-4 at 5-7 *with* Doc. 41-1]. In his sworn declaration, Plaintiff explained this discrepancy, stating that, in reproducing the JVA, he used the English word "partnership" rather than "joint venture," because this was more accurate after the AISA had accepted the JVA and formally created the partnership. [Doc. 65-1 at 5]. Beyond this difference, Section Ten is altered in the Partnership Agreement to relate to "Employment and Fairing of Employee," stating that "[t]he parties shall make dissection for hair and fair of employees."[1] [Doc. 55-4 at 7]. By contrast, Section Ten of the JVA relates to arbitration, and requires the parties to arbitrate any disputes "under the provisions of the Knoxville, Tennessee statutes." [Doc. 41-1 at 3]. Additionally, Section Thirteen of the JVA has been altered in the Partnership Agreement, in that a portion of the first sentence is omitted, resulting in a sentence in the Partnership Agreement which states, "On termination of this agreement for any cause whatever, the

---

[1] Both the title and contents of this section contain typographical errors, which this Court has repeated verbatim herein. It is unnecessary at this juncture for the Court to determine the meaning of this section.

partnership shall be[.]" [Doc. 55-4 at 7]. The JVA completes this sentence with "wound up and dissolved *in accordance with the Tennessee state statutes*." [Doc. 41-1 at 4].

The terms of the PSA included in the Partnership Agreement are identical to those in the PSA, with the exception of paragraph 4, which alters the wording of the agreement, and adds a clause that the agreement regarding the use of an Afghanistan bank account "cannot be changed unless both parties approved it." [*Compare* Doc. 55-4 at 7-8 *with* Doc. 1-2]. Although there are several discrepancies between the Partnership Agreement and the original JVA and PSA, it is not clear that any of these discrepancies constitute "inconsistent terms" such that the merger doctrine applies and Defendants are entitled to judgment as a matter of law. Accordingly, this Court will deny summary judgment on this ground.

### b. First Material Breach

Defendants next argue for summary judgment on Count One by asserting that Plaintiff was the first party to breach the PSA, and therefore, he cannot sue for a breach of that agreement. [Doc. 54-1 at 6-13]. Specifically, Defendants allege that, in 2012, Plaintiff used funds from a joint bank account to obtain a transportation license in the name of a sole proprietorship he had established, and then used the license and the sole proprietorship in an effort to convince the U.S. Government to convert the award of the NAT contract first option year from Defendant Vanquish to Plaintiff's sole proprietorship. [*Id.* at 7]. Defendants allege that Plaintiff also asked the government to substitute banking information on the NAT contract in an attempt to divert payments from Defendant Vanquish to his sole proprietorship. [*Id.*]. Defendants assert that these actions constitute material breaches by Plaintiff, which occurred before any alleged breaches on Defendants

part. [*Id*. at 8]. Plaintiff contests Defendants' characterization of his actions, instead alleging that he obtained the transportation license under a sole proprietorship with Mr. Barton's knowledge and consent, and was furthering the objectives of the partnership in doing so. [Doc. 64 at 7-8].

A genuine issue of material fact exists as to whether Plaintiff breached the JVA. In his deposition, Plaintiff stated that a transportation license was required for the NAT contract, and he discussed obtaining that license with Mr. Barton. [Doc. 55-2 at 10]. He explained that the transportation license only had his picture because Mr. Barton did not return to Afghanistan to jointly apply for the license. [*Id*. at 11]. He reiterated that he discussed the issue with Mr. Barton, and Mr. Barton agreed with Plaintiff obtaining the transportation license under a sole proprietorship. [*Id*. at 11-12]. In his sworn declaration, Plaintiff stated that there was a rush to get the transportation license, and he ultimately had to obtain the license as a sole proprietorship because Mr. Barton did not come to Afghanistan. [Doc. 65-1 at 8]. Plaintiff stated that, because the transportation license was issued to a new entity, the bank account for payments on the contract had to match the entity on the transportation license, and therefore, with Mr. Barton's agreement, Plaintiff opened a bank account under the sole proprietorship's name. [*Id*. at 8-9]. Plaintiff further stated that, after Mr. Barton cut all communication with him, he appealed to various government officials, with the intent of forcing Mr. Barton to honor the terms of their agreement, not to steal the NAT contract or deny Mr. Barton his share of the profits. [*Id*. at 9]. Accordingly, a genuine issue exists as to whether Plaintiff was acting, with Defendant Barton's consent, and for the furtherance of the partnership, in obtaining the

transportation license and bank account under a sole proprietorship, or whether such was an attempt to undermine the partnership and breach the JVA, as alleged by Defendants. This Court will deny summary judgment on this ground.

### c. Repudiation or Abandonment of the Agreements

Alternatively, Defendants assert that Plaintiff repudiated or abandoned the JVA and PSA by attempting to steal the NAT contract from Defendants. [Doc. 54-1 at 13]. Defendants argue that Plaintiff's actions indicated Plaintiff's intent to abandon all performance under the JVA and PSA. [*Id*. at 14]. The Defendants assert that the intentions of the parties to rescind the contract was clear by April 2013, when the parties submitted competing proposals for the NAT 2 contract. [*Id*. at 14-15]. Plaintiff contends that he did not repudiate or abandon the agreements, because the actions on which Defendants rely were actually done in an effort to continue the partnership. [Doc. 64 at 12-14].

For the reasons discussed above, there is a genuine issue of material fact as to whether Plaintiff's actions relating to the sole proprietorship constituted a repudiation or abandonment of the joint venture, or whether such was done in furtherance of the parties' agreements. Additionally, as to the competing proposals on the NAT 2 contract, Plaintiff admits that he and Mr. Barton submitted competing proposals for NAT 2, but indicates that he submitted a proposal on behalf of the partnership. [Doc. 65 at 18]. Plaintiff's submission of a proposal for NAT 2 by the partnership would not indicate that Plaintiff repudiated or abandoned the parties' agreements. Thus, a genuine issue of material fact exists as to whether the Plaintiff repudiated or abandoned the agreements, and summary judgment will be denied on this ground.

### d. Termination of the Agreements

Next, Defendants argue that, if the JVA and PSA were still in effect on December 18, 2013, the agreements terminated on that date, and therefore, summary judgment should be granted in their favor as to any alleged breach of those agreements that occurred thereafter. [Doc. 54-1 at 15]. Defendants contend that the plain language of the JVA stated that the agreement terminated three years from the effective date of the agreement, which was December 18, 2010, and the PSA was a supplement to the JVA, which rendered the JVA's termination date equally applicable to the PSA. Defendants specifically contend that summary judgment should be granted in their favor on any alleged breaches relating to the bidding of the NAT 1.5 contract in May 2014. [*Id*.]. Plaintiff contests that the agreements terminated, stating that he kept the partnership alive by taking actions to further the business, and noting that no formal dissolution of the joint venture occurred, as required by the JVA. [Doc. 64 at 14-15].

Section Twelve of the JVA states that "[t]he effective date of this agreement shall be the date first above written, and the agreement shall continue in effect for a period of 3 years from that date, or until *agreed upon by both parties*." [Doc. 41-1 at 4]. The effective date of the JVA was December, 18, 2010. [*Id*. at 1]. Section Thirteen adds that "[o]n termination of this agreement for any cause whatever, the joint venture shall be wound up and dissolved *in accordance with the Tennessee state statues* [sic]." [*Id*. at 4].

The language of the JVA is ambiguous as to whether the partnership automatically terminated three years after the effective date, when a later agreement which did not contain the termination date (the PSA) was signed by the parties, and the partnership was not

11

wound up and dissolved in accordance with the JVA's provisions. Thus, this Court must look to evidence of the parties' intent. *See Planters Gin Co.*, 78 S.W.3d at 890. However, the current evidentiary record lacks any significant evidence regarding the parties' intent for the termination of the JVA or PSA. Accordingly, this Court will deny summary judgment on this ground.

### e. Statute of Limitations

Defendants argue that Plaintiff's breach of contract claim raised in Paragraph 65(a) of the amended complaint, in which Plaintiff asserts that Defendant Barton breached the JVA by submitting a proposal for the NAT contract in the name of Vanquish United States, rather than Vanquish Afghanistan, is barred by the six-year statute of limitations. [Doc. 41 at 13; Doc. 54-1 at 16-17]. Defendants assert that Plaintiff became aware that Vanquish Afghanistan was not bid as the prime contractor on the NAT contract on April 6, 2011, and therefore, the instant suit, filed on June 20, 2017, was outside the six-year limitations period. [Doc. 54-1 at 16]. Plaintiff contests whether he knew of this breach on April 6, 2011, stating that the e-mail he received on that date used the phrase "sub" for "subcontractor," and, as a non-native English speaker, he did not understand the meaning. [Doc. 65 at 17]. Plaintiff states that he did not learn of this breach until August 2011. [*Id.*].

Tennessee generally applies a six-year statute of limitations to contract actions. Tenn. Code Ann. § 28-3-109(a)(3); *Benz-Elliot v. Barrett Enterprises, LP*, 456 S.W.3d 140, 152 (Tenn. 2015). Under the "discovery rule," a statute of limitations begins to run from the time that "a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof." *City State Bank v. Dean Witter*

*Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) (citation omitted). The question of whether a plaintiff has met this standard is factual in nature. *Gerdau Ameristeel, Inc. v. Ratliff*, 368 S.W.3d 503, 509 (Tenn. 2012).

A genuine issue of material fact exists as to when Plaintiff became aware that Mr. Barton had submitted a proposal on the NAT contract in the name of Vanquish United States, rather than in the name of the partnership, Vanquish Afghanistan. The record indicates that on April 6, 2011, Mr. Barton sent Plaintiff an email requesting certain documents "for the NAT proposal using Vanquish Worldwide Afghanistan as the sub." [Doc. 55-7 at 1]. Plaintiff provided the requested documentation on April 7. [Doc. 55-8 at 1]. In his sworn declaration, Plaintiff stated that he did not understand the use of the term "sub" in the e-mail, and did not understand that the partnership would be a subcontractor. [Doc. 65-1 at 2-3]. Plaintiff asserted that, after another e-mail exchange, he informed Mr. Barton that he strongly objected to the proposal and would not sign it, because the partnership was supposed to be the prime contractor, not a subcontractor. [Doc. 65-1 at 3].

On June 1, 2011, Tiffany Midyett, an employee of Vanquish United States, emailed Plaintiff, informing him:

The proposal was written as follows:

Vanquish Worldwide LLC – US Company (Prime)

Vanquish Worldwide – Afghanistan (Subcontractor) Providing all of the trucking

[Doc. 55-9 at 1]. Ms. Midyett continued on to say that they needed to register Vanquish the US Company, and could call it Vanquish and leave the worldwide off the name or call

it Vanquish Worldwide LLC. However, Plaintiff responded[2] that the company was registered in the name of Vanquish Worldwide in Afghanistan, and he did not want to register another company with the same or similar name. Plaintiff also stated that "we can't sign any other protocol or agreement as subcontractor[.]" [*Id*.]. In his sworn declaration, Plaintiff stated that he did not learn until August 2011, when the government announced the NAT award, that Mr. Barton had gone forward with a proposal that made the partnership a subcontractor, over Plaintiff's objection. [Doc. 65-1 at 3]. From this, the record presents a genuine issue of material fact as to when Plaintiff actually learned that the NAT proposal had been submitted with Vanquish United States as the prime contractor and Vanquish Afghanistan as the subcontractor. Accordingly, this Court will deny summary judgment on this ground.

### f. Defendant Vanquish as a Party to the PSA

Next, Defendants argue that the plain language of the PSA makes clear that Defendant Vanquish is not a party to that agreement, and therefore, Defendant Vanquish should be granted dismissal on Count 1, or, in the alternative, granted summary judgment on Count 1. [Doc. 54-1 at 17-18]. Plaintiff asserts that Defendant Vanquish has contractual obligations under the PSA. [Doc. 64 at 18-19].

---

[2] It is unclear from the timestamps on the e-mail exchange whether Ms. Midyett was responding to Mr. Koshani, or vice versa. However, Plaintiff asserts that his e-mail was a response to Ms. Midyett. [Doc. 65 at 8]. For purposes of summary judgment, this Court will construe the evidence in the light most favorable to the plaintiff, as the non-moving party, and assume that Plaintiff's e-mail was a response to Ms. Midyett's email.

The PSA begins with a statement that "Barton President of Vanquish worldwide registered in Wyoming and vice president of Vanquish worldwide registered in Afghanistan" acknowledged agreements with "Shafiqullah Koshani President of Vanquish worldwide in Afghanistan." [Doc. 41-2, ¶ 1]. The PSA states that "[t]he net profit earned by the Vanquish worldwide . . . shall be divided among the parties as follow: *Eric Barton shall receive 50% Percent and Shafiqullah Koshani shall receive 50% percent of profit after expenses.*" [*Id.*, ¶ 2]. The PSA continues to state that "the profit that will be earned *in NAT Shafiqullah Koshani shall earn 50% of the whole profit after expenses and Eric Barton shall receive 50% of the whole contract after expense as per our agreement*[.]" [*Id.* ¶ 3].

In his sworn declaration, Mr. Barton stated that he sent a draft PSA to Plaintiff on September 4, 2011, and, after modification, the document became the PSA. [Doc. 55-1 at 1]. In a draft of what would become the PSA, Vanquish United States and Plaintiff were the parties to the agreement. [Doc. 55-1 at 6]. However, the amended document, which became the PSA, contained several changes in the document's language, and was signed by Mr. Barton and Plaintiff. [Doc. 55-1 at 8]. In his sworn statement, Plaintiff asserts that, in negotiating the PSA, there was no question that Defendant Vanquish was committing to share profits, but Mr. Barton was vague as to what he would personally agree to, thus, Plaintiff insisted that the PSA be agreed upon both by Mr. Barton as owner of Vanquish United States and Vice President of Vanquish Afghanistan, so that both Mr. Barton and the company would be committing to the agreement. [Doc. 65-1 at 4].

A genuine issue of material fact exists as to whether the parties intended Defendant Vanquish to be a party to the PSA. The PSA's language, identifying Mr. Barton as the President of Defendant Vanquish, creates ambiguity as to whether Mr. Barton was signing the agreement in his personal capacity only, or whether he was also signing the agreement on behalf of his company, Defendant Vanquish. Because ambiguity exists, the parties' intent is relevant. *See Planters Gin Co.*, 78 S.W.3d at 890. As the record evidence described above shows, a genuine issue of material fact exists as to whether the parties intended Defendant Vanquish to be a party to the PSA. Accordingly, summary judgment is denied on this ground.

### g. JVA Terminated on December 31, 2010

Defendants also argue that the JVA terminated on December 31, 2010, because the terms of the JVA stated that it would terminate if either party failed to contribute money or property to the joint venture before that date, and neither party contributed money by that date. [Doc. 54-1 at 18]. Plaintiff asserts that both he and Mr. Barton contributed property in December 2010, and thus, the JVA did not terminate in December 2010. [Doc. 64 at 19-21].

A genuine issue of material fact exists as to whether the parties contributed property to the joint venture by December 31, 2010. Section Two of the JVA states that Mr. Barton and Plaintiff were required to contribute money to the joint venture according to their percentage, and "[c]ontributions of money and property shall be made on or before 31 Dec 2010. Failure of either party to complete the contribution on a timely basis shall result in *termination of this agreement*." [Doc. 41-1 at 1]. Mr. Barton, in his declaration, stated that

16

he did not contribute money or property to the joint venture before December 31, 2010. [Doc. 55-1 at 1]. Plaintiff, in his declaration, stated that he contributed money and property to the partnership, including obtaining a lease on a house to use as an office in December 2010. [Doc. 65-1 at 2]. Plaintiff stated that Mr. Barton did not initially contribute money to the partnership, but did pay for some initial things, including the website development. [*Id.*]. Likewise, in his deposition, Plaintiff testified that Mr. Barton paid for some of the "initial things" in the United States, like making the website. [Doc. 65-34 at 12]. Based on this factual record, there is a genuine issue as to whether Plaintiff and Defendant Barton contributed property to the partnership prior to the December 31, 2010, deadline, and this Court will deny summary judgment on this ground.

### h. Requirement to Split Profits of Defendant Vanquish

In their final argument regarding Count One, Defendants request summary judgment as to paragraphs 66.b and 66.c of the amended complaint, which allege breaches of the PSA for failure to pay 50 percent of the net profits of Vanquish United States on the NAT contract (¶ 66.b) and 50 percent of the net profits of Vanquish United States on business operations in Afghanistan (¶ 66.c). [Doc. 41 at 13-14; Doc. 54-1 at 19-21]. As to ¶ 66.c, Defendants assert that Clause 2 of the PSA amended the previously-agreed upon profit split as to the NAT contract, and did not entitle Plaintiff to any portion of Vanquish United States's net profit on other work in Afghanistan. [Doc. 54-1 at 19-20]. As to ¶ 66.b, Defendants assert that Clause 3 of the PSA entitled Plaintiff to 50% of the net profits of Vanquish Afghanistan, not 50% of the net profits of Vanquish United States. [*Id*. at 20-21]. Plaintiff responds that, when read as a whole, the PSA imposes obligations on Defendant

Vanquish, and the parties conducted themselves consistent with an understanding that the net profits of the NAT prime contractor, which was Vanquish United States, but should have been Vanquish Afghanistan, would be shared. [Doc. 64 at 21-22]. Plaintiff also asserts that the PSA's reference to profits "earned in NAT" must have referred to the profits of Defendant Vanquish, which was the entity that would be earning the NAT profits. [*Id.* at 21].

Section Two of the PSA states that "[t]he net profit earned by the Vanquish worldwide at the end of each fiscal year or month shall be divided among the parties as follow: *Eric Barton shall receive 50% Percent and Shafiqullah Koshani shall receive 50% percent of profit after expenses*." [Doc. 41-2]. Section Three of the PSA states that "the profit that will be earned *in NAT Shafiqullah Koshani shall earn 50% of the whole profit after expenses and Eric Barton shall receive 50% of the whole contract after expenses as per our agreement and AISA license*." At the beginning of the agreement, the PSA identified Mr. Barton as "President of Vanquish worldwide registered in Wyoming and vice president of Vanquish worldwide registered in Afghanistan." [*Id.*]. Because the PSA used the term "Vanquish worldwide" to refer to both Vanquish United States and Vanquish Afghanistan, it is ambiguous as to which entity is referenced in Sections Two and Three of the agreement. Thus, the parties' intent is relevant in determining whether the PSA applies to the profits of Vanquish United States or Vanquish Afghanistan. *See Planters Gin Co.*, 78 S.W.3d at 890.

A genuine issue of material fact exists as to whether the parties intended (a) Section 2 of the PSA to grant Plaintiff the right to 50% of the Vanquish United States' profits from

activities in Afghanistan, and (b) Section 3 of the PSA to grant Plaintiff the right to 50%

of the NAT profit accrued by Vanquish United States, as opposed to that of Vanquish

Afghanistan. In his sworn declaration, Plaintiff explained that, after he discovered that

Mr. Barton had submitted the NAT proposal with Vanquish United States as the prime

contractor and Vanquish Afghanistan as a subcontractor, he expressed to Mr. Barton that

they would either do business together as they had agreed, or they would not do business

together at all. [Doc. 65-1 at 4]. The parties thereafter agreed to continue to run the NAT

contract as partners, but share the profits 50/50, specifically, "the profits of Vanquish

Worldwide L.L.C." Plaintiff stated that there was never any question that Vanquish

Worldwide United States was committing to sharing profits with him, and Mr. Barton even

asked Plaintiff to share in funding the operational expenses of Vanquish United States.

[*Id*.]. The parties formalized these agreements in the PSA. [*Id*. at 4-5]. Construing this

evidence in the light most favorable to Plaintiff, as the non-moving party, a genuine issue

of material fact exists as to whether profit-sharing provisions of the PSA refer to the profits

of Vanquish Afghanistan or to Vanquish United States, and summary judgment is denied

on this ground.

### B. Counts Two Through Four and Six through Ten Barred by Plaintiff's Theory

Defendants argue that Counts Two through Four and Six through Ten of the

amended complaint all arise out of the PSA and JVA, and all fail for the same reason as

Count One, namely, that the PSA and JVA were superseded by the Partnership Agreement.

[Doc. 54-1 at 22-23]. Plaintiff argues that neither the JVA nor PSA were merged or

rescinded. [Doc. 64 at 23-24]. As discussed above, a genuine issue of material fact exists as to whether the JVA or PSA were merged or rescinded. Accordingly, for the same reasons discussed above, summary judgment is denied on this ground.

### C. Counts Four and Five Barred by Unclean Hands

Defendants also argue that Counts Four and Five, which are equitable claims, are barred by Plaintiff's own inequitable actions, namely, his attempts to steal the NAT contract. [Doc. 54-1 at 23-24]. Plaintiff again contests Defendants' characterization of his actions, reiterating that he acted with Mr. Barton's full knowledge and consent and was not attempting to steal the NAT contract. [Doc. 64 at 24].

The doctrine of unclean hands is based on the principle that he who seeks equity must do equity, and that he who has done inequity cannot have equity. *In re Estate of Boote*, 265 S.W.3d 402, 417 (Tenn. Ct. App. 2007). The doctrine, when applicable, provides the court with a basis to decline to grant equitable relief to parties who have willfully engaged in unconscionable, inequitable, immoral, or illegal acts with regard to the subject matter of their claims. *Id*.

As discussed with regard to several of Defendants' prior arguments, there is a genuine issue of material fact as to whether the Plaintiff's actions relating to the sole proprietorship constituted some attempt to "steal" the NAT contract, or whether Plaintiff's actions were in furtherance of the parties' agreements. Thus, a genuine issue of material fact exists as to whether Plaintiff acted with "unclean hands", and summary judgment will be denied on this ground.

**D. Damages for Counts Three and Four Partially Repaid**

Finally, Defendants request partial summary judgment as to Counts Three and Four of the amended complaint, stating that Plaintiff has admitted that $849,750 of the $1.1 million sought under those counts has been repaid. [Doc. 54-1 at 24]. Plaintiff asserts that, while he has received total payments of $849,750, and this total damages should be reduced by that amount, it is unclear whether the amounts repaid were returns of capital or profits. [Doc. 64 at 24-25].

The Defendants' argument regarding the offset of any damages is premature at the summary judgment stage. Before this Court can determine whether, and to what extent, Plaintiff's damages should be offset by any payments, a determination must first be made as to whether the Plaintiff is entitled to any damages, and what those damages may be. Accordingly, the Court will deny partial summary judgment on this ground. However, the Defendants may reserve their argument regarding offset of damages for the appropriate time.

## IV. Conclusion

Accordingly, for the reasons stated herein, the Defendant's motion for summary judgment will be denied. An order consistent with this opinion will be entered.

      s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE