IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

SHAFIQULLAH KOSHANI,                          )
                                              )
                 Plaintiff,                   )
                                              )
v.                                            )         No. 3:17-CV-265
                                              )
ERIC WAYNE BARTON, and                        )
VANQUISH WORLDWIDE, L.L.C.,                    )
                                              )
                 Defendants.                  )


## MEMORANDUM OPINION

This civil action is before the court for consideration of Plaintiff/Counter-Defendant's ("Plaintiff") motion for summary judgment. [Doc. 203]. Defendants/Counter-Plaintiffs ("Defendants") have filed a response, and Plaintiff has submitted a reply. [Docs. 206, 211]. Also before the Court is Plaintiff's motion for an extension of time to file a reply, which Defendants do not oppose [doc. 208], and Defendants' motion to strike the evidence submitted with Plaintiff's reply brief [doc. 212]. For the reasons that follow, the motion for extension of time [doc. 208] is granted, to the extent that the Court has considered Plaintiff's reply brief, the motion to strike [doc. 212] is denied as moot, as the Court has not relied on the evidence submitted with Plaintiff's reply brief in formulating this opinion, and the motion for summary judgment [doc. 203] is granted in part and denied in part.

# I.    Background

The plaintiff, Shafiqullah Koshani, a citizen and resident of Afghanistan, filed suit against defendants Eric Barton, a citizen of the United States, and Vanquish Worldwide, LLC, alleging that he and Mr. Barton established a joint venture in Afghanistan in 2010. [Doc. 41 at 103].  Plaintiff maintains that the parties named their new business Vanquish Worldwide ("Vanquish Afghanistan") and pursued a contract with the United States Army, which was soliciting bids for a project known as "National Afghan Trucking," or "NAT," in Afghanistan.  [*Id*. at 1, 4-5].  Plaintiff alleges that Mr. Barton submitted a proposal to the United States in response to the NAT solicitation, but instead of submitting it in Vanquish Afghanistan's name, he submitted the proposal on behalf of a company with a nearly identical name, Vanquish Worldwide, LLC ("Vanquish United States")—a company that he allegedly owned in Tennessee—and tabbed Vanquish Afghanistan as a subcontractor that would render services under the contract.  [*Id*. at 3, 7].  The United States ultimately awarded the NAT contract to Vanquish United States.  [*Id*. at 8].  Plaintiff ultimately alleges that he was not paid profits from the NAT contract, and filed suit to recover those lost profits.  [*Id*. at 12].

Defendants respond with several counterclaims.  [Doc. 75].  Defendants state that they submitted a proposal for the NAT contract which listed Vanquish United States as the prime contractor and Vanquish Afghanistan as the subcontractor, after their initial subcontractor, United Sadat Transportation and Logistics Company ("USC"), partially owned by Plaintiff's brother Farid Koshani, backed out.  [*Id*. at 24-25].  After receiving the NAT contract, Vanquish United States allegedly hired Plaintiff's brother Jawid Koshani to

2

serve as Operations Manager under the NAT contract, and Jawid signed a Confidentiality, Non-Disclosure, and Non-Competition Agreement ("NDA") with Vanquish United States. [*Id*. at 25]. The NDA stated that, during his employment, and for one year after, Jawid would not "[s]olict, divert, or appropriate, or attempt to solicit, divert or appropriate, directly or by assisting others, any business from any of Vanquish's customers . . . for purposes of providing products or services that are competitive with those provided by Vanquish[.]" [*Id*. at 26].

Defendants allege that, after the award of the NAT Contract, Plaintiff refused to allow Vanquish Afghanistan to perform trucking missions, and suggested that Defendants use USC as a subcontractor instead. [*Id*.]. After further discussion, Plaintiff ultimately agreed to use Vanquish Afghanistan for NAT trucking missions, and signed several agreements on the matter. [*Id*. at 26-27]. However, Defendants state that they later learned that Plaintiff did not truly intend for Vanquish Afghanistan to perform any trucking missions, and every mission was given to USC rather than Vanquish Afghanistan. [*Id*. at 27].

Defendants allege that at the end of the NAT contract base period, when the United States Army began awarding the first option year, Plaintiff began "making plans to steal the NAT Contract," and recruited his brother Jawid to assist in this scheme. [*Id*.]. Defendants state that Plaintiff created a new Afghan sole proprietorship under a name similar to Vanquish Worldwide that was 100% owned by Plaintiff, registered it with Afghan authorities, and set up a new Afghan bank account for the sole proprietorship. [*Id*. at 28]. Defendants allege that Plaintiff and Jawid made false statements to the U.S.

Government in an effort to convince officials to issue the NAT contract option year to the sole proprietorship rather than Vanquish United States. [*Id*.]. Defendants state that Plaintiff lied to government officials about his entitlement to the NAT contract option year, as well as stating that Mr. Barton had forged signatures on contracts and lied to contracting officials. [*Id*. at 29-30]. Defendants allege that Plaintiff's efforts were successful when the government suspended payments to Vanquish United States under the NAT contract, and also suspended Vanquish United States from receiving any missions under the NAT contract, beginning in October 2012. [*Id*. at 30].

In their counterclaims, Defendants allege claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of the duty not to misuse partnership assets, tortious interference with contract, statutory inducement of a breach of contract, and conspiracy. [*Id*. at 31-39]. Plaintiff now seeks summary judgment on these counterclaims.

## II.   Standard of Review

Summary judgment is appropriate when the moving party shows that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's case," at which point the non-moving party,

to withstand summary judgment, must identify facts in the record that create a genuine issue of material fact. *Id*. at 324-25.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.    Analysis

### A. Statute of Limitations

The parties have raised various arguments relating to whether Counterclaims 1, 4, 5, 6, and 7 are barred by applicable statutes of limitations, and whether various tolling doctrines apply. This Court will first address whether these counterclaims were filed outside the limitations period, and then address whether any tolling doctrines are applicable.

### 1. Discovery Rule

In his motion for summary judgment, Plaintiff contends that Counterclaims 1 and 4-7 are barred by the applicable statutes of limitations. [Doc. 204 at 1-3]. Plaintiff states that e-mails from September, October, and November of 2012 indicate that Defendants were aware that Plaintiff was communicating with the contracting officer and claiming an ownership in Vanquish United States or the NAT contract, and thus, the counterclaims are untimely. [*Id*. at 3]. Defendants assert that the e-mails on which Plaintiff relies do not show that Defendants were aware of their injury and that the Plaintiff was the person who caused the injury, and they did not learn such information until 2015, when documentation was produced as part of an Armed Services Board of Contract Appeals ("ASBCA") appeal, related to Vanquish United States's suspension under the NAT contract. [Doc. 206 at 4-8]. Plaintiff replies that Defendants do not deny that they were on inquiry notice as to Count 1 in 2011. [Doc. 211 at 3-6].

Tennessee generally applies a six-year statute of limitations to contract actions. Tenn. Code. Ann. § 28-3-109(a)(3); *Benz-Elliot v. Barrett Enterprises, LP*, 456 S.W.3d 140, 152 (Tenn. 2015). Tennessee also applies a three-year statute of limitations to tort actions involving injuries to personal or real property. Tenn. Code. Ann. § 28-3-105. A claim for interference with contract falls under this three-year limitations period. *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31, n.1 (Tenn. 2007). Suits for conspiracy, whether arising incident to a contract or not, are actions in tort and are governed by the applicable tort statute of limitations. *Harvest Corp v. Ernst & Whinney*, 610 S.W.2d 727, 729 (Tenn. Ct. App. 1980). Because the alleged conspiracy relates to the interference with contract

claims, a three-year limitations period also applies to the conspiracy claim. The parties do not contest that these are the applicable statutes of limitations for the counterclaims at issue.

Under the "discovery rule," a statute of limitations begins to run from the time that "a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof." *City State Bank v. Dean Witter Reynolds*, *Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) (citation omitted). Thus, in Tennessee, "a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (internal quotation marks omitted); *see also Pero's Steak and Spaghetti House v. Lee*, 90 S.W.3d 614, 621 (Tenn. 2002). "The statute of limitations is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry." *Wyatt v. A-Best, Co., Inc.*, 910 S.W.2d 851, 854 (Tenn. 1995) (internal quotation marks and alterations omitted). Once a plaintiff gains information sufficient to alert a reasonable person of the need to investigate the injury, the limitations period begins to run. *Robinson v. Baptist Mem'l Hosp.*, 464 S.W.3d 599, 608 (Tenn. Ct. App. 2014).

Tennessee courts have refined the discovery rule to include not only discovery of the injury, but the discovery of the source of the injury. *Redwing*, 363 S.W.3d at 458. However, the discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the

damages or the specific type of legal claim he has. *Id*. at 459. "The discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim." *Id*.

Although the question of whether a plaintiff exercised reasonable care and diligence in discovering an injury or wrong is *generally* a question of fact for the jury, *Wyatt*, 910 S.W.2d at 854 (emphasis added), summary judgment is still appropriate if the evidence indicates that there is no genuine issue of material fact as to whether a plaintiff knew of facts sufficient to put a reasonable person on notice that he suffered an injury as a result of wrongful conduct. Here, Plaintiff relies on several e-mails sent by Mr. Barton in late 2012 as evidence that Mr. Barton was aware of the basis for his counterclaims at that time. The Court will address each of the challenged counterclaims in turn.

## Counterclaim 1

In Counterclaim 1, Defendants allege that Mr. Koshani and Mr. Barton entered into various agreements, which Defendants allege Mr. Koshani breached in refusing to use Vanquish Afghanistan as the trucking subcontractor under the NAT contract. [Doc. 75 at 31]. Defendant Barton alleges that he suffered damages from this breach, namely, not receiving his portion of the profits that Vanquish Afghanistan should have earned for performing missions under the NAT contract. [*Id*.]. Defendants state that they were awarded the NAT contract in August 2011. [*Id*. at 25]. Defendants further state that "[s]hortly after award of the NAT contract, Barton traveled to Afghanistan. Upon his arrival, Plaintiff refused to allow [Vanquish Afghanistan] to perform trucking missions[.]" [*Id*. at 26]. Defendants allege that, thereafter, Mr. Barton and Mr. Koshani entered into a

Profit Sharing Agreement ("PSA") and, later, a Partnership Agreement, which incorporated an agreement as to the use of Vanquish Afghanistan as a trucking subcontractor. [*Id*. at 26-27]. Defendants allege that only after the PSA and Partnership Agreement were executed did Mr. Barton learn that Mr. Koshani did not truly intend for Vanquish Afghanistan to perform any trucking missions, and instead, gave every trucking mission to USC. [*Id*. at 27].

Plaintiff's only argument that Count 1 is barred by the statute of limitations is that, based on the language of the counterclaim, this alleged breach occurred "[s]hortly after award of the NAT contract . . . which occurred in August 2011." [Doc. 204 at 2]. However, this is a mischaracterization of the allegations in the counter-complaint. The counter-complaint clearly states that, after Defendants first learned that Plaintiff would not allow Vanquish Afghanistan to act as a trucking subcontractor, which was discovered shortly after award of the NAT contract, Plaintiff and Defendants entered into several agreements between themselves on the matter. The counterclaim for breach of contract asserts that Plaintiff later breached these agreements, when he did not allow Vanquish Afghanistan to complete any trucking missions. No time frame for the discovery of this information is mentioned in the counter-complaint, nor is this addressed by any of the parties in their briefings regarding this motion for summary judgment.

The Court acknowledges that there may be evidence in the record establishing that Mr. Barton became aware of Mr. Koshani's failure to provide trucking services under the PSA or Partnership Agreement at some point beyond the applicable six-year limitations period. However, because Plaintiff, as the moving party, bears the burden of proving that

there is no genuine issue of material fact at the summary judgment stage, *see Celotex*, 477 U.S. at 323, this Court will not search for evidence that the Plaintiff has not identified, even if such would support dismissal of the counterclaim. Accordingly, because Plaintiff's only argument that Counterclaim 1 is barred by the statute of limitations is based on an inaccurate summary of the counterclaim, the motion for summary judgment will be denied on this ground.

**Counterclaims 4, 5, and 7**

In Counterclaims 4 and 5, Defendants allege Plaintiff interfered with the Defendants' NAT contract by providing "false information to the U.S. Government regarding ownership of Defendant Vanquish, who was the proper party to the NAT Contract, and the circumstances under which the NAT Contract award was made." [Doc. 75 at 33-35]. In Claim 7, Defendants allege that Plaintiff conspired with his brother Jawid to make these false statements to the government and interfere with the NAT contract. [*Id.* at 36-37].

On September 17, 2012, Mr. Barton sent an e-mail to Mr. Koshani, copying Farid Koshani and Jawid Koshani, titled "Update on KO Communications."[1] [Doc. 205-1 at 21]. Mr. Barton stated: "I understand you have contacted the contracting officer and other officials in Kabul." He further stated "I have been informed that you are claiming to own Vanquish Worldwide, LLC, the United States company," and asked for confirmation of such. [*Id.*].

---

[1] "KO" is a military abbreviation for contract officer.

On October 6, 2012, Mr. Barton e-mailed Major Marian Feist, copying the contracting officer Effie Fragogiannis. [*Id*. at 22]. Mr. Barton stated: "there is something holding up our invoices." Mr. Barton then provided an update of matters that had recently occurred with Mr. Koshani. Mr. Barton stated that "Koshani has requested that I pay him profits from the American business that I own" and "has claimed that he is entitled to payments because his name is on the Afghan license." Mr. Barton also stated that he was aware that Mr. Koshani had "emailed your office that he is somehow in charge of my business, owned and operated 100% by me since June of 2007." [*Id*.].

On November 13, 2012, Mr. Barton e-mailed Ms. Fragogiannis, requesting a conference call about the suspension, and noting that his company had no performance issues "minus Shafiq's ability to interfere with our contract." [*Id*. at 60]. In another e-mail that same day, which Mr. Barton sent to Ms. Fragogiannis, Mr. Barton stated that Mr. Koshani "has interfered with our business and our employees." He stated that Mr. Koshani's "claims are false and without merit, but they continue to impact my prime contract." Mr. Barton stated that Mr. Koshani had started two other websites using Vanquish United States's logos, pictures, wording, etc. and had obtained numerous licenses with the Vanquish corporate name in different variations. Mr. Barton also noted that Mr. Koshani had "asked his brothers, both Farid and Jawid, to meet with me in Dubai and demand I put bank accounts in overseas countries and that I sign an agreement listing him as the owner of my business." [*Id*.]. Mr. Barton stated that he felt he was being extorted, and concluded that "[i]t is unbelievable that Shafiq has been able to interfere with my business to the extent he has thus far." [*Id*. at 60-61].

The Court is convinced that by at least November of 2012, Mr. Barton was aware of "facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct," as to Counterclaims 4, 5, and 7. *See Redwing*, 363 S.W.3d at 459. Indeed, Mr. Barton specifically alleged that Mr. Koshani was "interfer[ing] with our contract," when e-mailing U.S. military officials in November. [*See* Doc. 205-1 at 60]. As to Counterclaim 7, the conspiracy claim, it is also clear that by November 2012 Mr. Barton was aware that Mr. Koshani had involved his brother Jawid to some extent, as Mr. Barton specifically states that Mr. Koshani had asked Jawid to meet Mr. Barton and ask him to sign an agreement listing Mr. Koshani as an owner of Vanquish United States.

Defendants appear to contest whether these e-mails are sufficient to show that Mr. Barton knew that Mr. Koshani's actions were the cause of the government's suspension of Vanquish United States, however, the context of the October and November e-mails make clear that Mr. Barton was contacting government officials, and providing details about the conflict with Mr. Koshani, because he believed that such conflict was relevant to Vanquish United States' suspension. There is no other reasonable interpretation of Mr. Barton's language in the November e-mail, asserting that Mr. Koshani was interfering with "our" contract, which clearly refers to the NAT contract between Defendants and the United States government. Moreover, to the extent that the Defendants assert that they did not learn of "the content of Mr. Koshani's discussions with the Government; Mr. Koshani's false statements to the Government that Mr. Barton won award of the NAT Contract by fraudulently using the AISA license of VW-A or otherwise; or that Mr. Koshani had asked the Government officials to suspend NAT Contract

payments to Vanquish – US," which were "facts that are critical to the viability of Defendants' claims," [doc. 206 at 5, n.6], such information was not necessary for the limitations period to begin running. As noted above, "the discovery rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim." *See Redwing*, 363 S.W.3d at 458.

Because Mr. Barton had information sufficient to alert a reasonable person of the need to investigate the injury in November 2012, the limitations period began to run at that point. *See Robinson*, 464 S.W.3d at 608. Thus, Defendants had three years from this time to file these claims for interference with contract and conspiracy. However, Defendants waited until August 2017 to raise their interference with contract claims, and July 2018 to raise the conspiracy claim. Both of these dates are well after the three-year statute of limitations expired. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Counterclaims 4, 5, and 7 are barred by the statute of limitations.

## Counterclaim 6

In Counterclaim 6, Defendants allege that Jawid Koshani breached the the NDA that he signed with Vanquish United States, by conspiring with Plaintiff to solicit, divert, or appropriate the NAT contract. [Doc. 75 at 35-36]. Defendants assert that Plaintiff intentionally induced Jawid's breach of the NDA. [*Id*. at 36].

In arguing that Counterclaim 6 is barred by the applicable three-year statute of limitations, Plaintiff lumps Counterclaim 6 with Counterclaims 4, 5, and 7. However, the Court is not convinced that Mr. Barton's knowledge, as exemplified by his September, October, and November 2012 e-mails, was sufficient to establish that a reasonable person

would have known of the injury alleged in Counterclaim 6, and thus, been on notice of the need to investigate further. The Court notes that the November 2012 e-mail did indicate that Mr. Barton was aware at that time that Plaintiff had asked both of his brothers, including Jawid, to meet with Mr. Barton and ask him to sign an agreement to list Mr. Koshani as an owner of Vanquish United States. However, it is not clear from the text of the e-mails that Mr. Barton knew of conduct on behalf of Jawid that necessarily rose to the level of a breach of the NDA. Moreover, the parties do not provide any further argument as to this issue, and the Plaintiff bears the burden of proving that no genuine issue of material fact exists at this stage. *See Celotex*, 477 U.S. at 323. Viewing the evidence in the light most favorable to the non-moving party, the Court is unwilling to say that no genuine issue of material fact exists as to whether Counterclaim 6 is barred by the applicable statute of limitations. Thus, the motion for summary judgment will be denied as to this claim.

### 2. Tolling

Because the Court has concluded that Counterclaims 4, 5, and 7 were filed outside the applicable statute of limitations, the Court will next address whether any of the tolling doctrines raised by Defendants apply to save these counterclaims from summary judgment.

### **Suspension Statute**

In their response to the motion for summary judgment, Defendants contend that the statutes of limitations were tolled until June 20, 2017, under Tenn. Code Ann. § 28-1-111, because Plaintiff resided outside the state of Tennessee. [Doc. 206 at 2-3]. Plaintiff replies

that Tenn. Code Ann. § 28-1-111 does not apply when a valid method of serving process on an out-of-state defendant is available, which was the case here.  [Doc. 211 at 2-3].

Tennessee law provides that:

> If at any time any cause of action shall accrue against any person who shall be out of this state, the action may be commenced within the time limited therefor, after such person shall have come into the state; and, after any cause of action shall have accrued, if the person against whom it has accrued shall be absent from or reside out of the state, the time of absence or residence out of the state shall not be taken as any part of the time limited for the commencement of the action.

Tenn. Code. Ann. § 28-1-111.  The Tennessee Supreme Court has held that "when the remedy of the suitor is complete and unaffected by the absence of the defendant, when his non-residence does not affect the right to sue, [the statute] providing that 'the time of his absence or residence out of the state shall not be taken as any part of the time limited for commencement of the action' is without application."  *Arrowood v. McMinn Cty.*, 121 S.W.2d 566, 567 (Tenn. 1938).  That Court ultimately concluded that the exception made in this statute does not apply unless the person's absence from the state prevents service of process.  *Id.* at 568.  The *Arrowood* rule was formulated to limit the application of the suspension statute to situations where it was truly necessary.  *Lam v. Smith*, 891 S.W.2d 207, 212 (Tenn. 1994).  The rule "is intended to prevent a plaintiff from using the suspension statute to toll indefinitely the limitations period while disregarding valid available methods of serving a nonresident defendant" and "essentially punishes the plaintiff for failing to take advantage of available methods of service."  *Id.*  The question in determining whether the suspension statute applies is whether the plaintiff has unjustifiably failed to use an available method of service.  *Id.*

Tennessee Rule of Civil Procedure 4A provides several options for service upon a defendant in a foreign country. Tenn. R. Civ. P. 4A. Specifically, the rule allows for service: (1) by any internationally agreed means reasonably calculated to give notice; (2) in the manner prescribed by the law of the foreign country; (3) as directed by the foreign authority in response to a letter rogatory or letter of request; (4) delivery to the individual personally a copy of the summons and the complaint; (5) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party served; or (6) other means not prohibited by international agreement as may be directed by the court. *Id*.

Here, the Tennessee suspension statute is plainly inapplicable. The Tennessee Rules of Civil Procedure provide a plethora of ways that Defendants could have served a complaint upon Plaintiff, even while Plaintiff was residing in a foreign country. Notably, the rule allows service through delivery of a copy of the summons and complaint to the individual personally. Given the scenario here, there is no clear reason why Defendants could not have had Mr. Koshani personally served with a summons and complaint. Moreover, there is no evidence that Defendants ever contacted the Afghanistan government to inquire about serving Plaintiff in Afghanistan, nor did the Defendants ever file any requests regarding such in this Court. Instead, Defendants merely waited until Plaintiff had filed suit against them to formulate and file their counterclaims against Plaintiff. This conduct is not protected by the Tennessee suspension statute. *See Lam*, 891 S.W.2d at 212. Accordingly, the Court finds that Defendants' claim that the statute of limitations was tolled because Plaintiff was out-of-state is meritless.

**Equitable Tolling**

Defendants briefly assert that the doctrine of equitable estoppel should toll the running of the statute of limitations because Plaintiff misled them into failing to file their action within the limitations period, based on his concealment of his communications with the government.  [Doc. 206 at 9, n.9].  Defendants specifically assert that Plaintiff's failure to copy Mr. Barton on his e-mails to government officials indicate that he was actively concealing that information.  [*Id*. at 8-9].

The doctrine of equitable estoppel tolls the running of the statute of limitations where a defendant has "misled the plaintiff into failing to file his action within the statutory period of limitations." *Fahrner v. SW Mfg. Inc.*, 48 S.W.3d 141, 145 (Tenn. 2001) (internal quotation marks and alterations omitted).  Equitable estoppel requires "deception or misconduct" by the defendant, *Norton v. Everhart*, 895 S.W.2d 317, 321 (Tenn. 1995), and it "only applies when the defendant has taken steps to specifically prevent the plaintiff from timely filing his complaint (as where he promised not to plead the statute of limitations)." *Fahrner*, 48 S.W.3d at 146.  Thus, when equitable estoppel has been raised, the Court must determine whether the defendant engaged in conduct specifically designed to prevent the plaintiff from suing in time.  *Id.* at 145.

Defendants essentially rely on the allegations of wrongdoing in their counterclaims as the basis for their assertion that equitable tolling should apply.  But those allegations are that Plaintiff secretly communicated with government officials, and did not inform Mr. Barton of these communications.  There is absolutely no evidence indicating that Plaintiff did not inform Mr. Barton of these communications with a specific intent to

prevent Mr. Barton from timely filing a complaint based upon his actions. Defendants position both stretches the doctrine of equitable estoppel too far, and assumes too much from the available facts. Accordingly, the Court finds that equitable estoppel is not applicable, and the applicable statutes of limitations were not tolled.

In sum, the evidence presented shows that there is no genuine issue of material fact as to whether Counterclaims 4, 5, and 7 are barred by the applicable statute of limitations. Thus, the motion for summary judgment will be granted as to Counterclaims 4, 5, and 7, and those counterclaims will be dismissed. However, a genuine issue of material fact exists as to whether Counterclaims 1 and 6 are barred by the applicable statutes of limitations, and the motion for summary judgment will be denied as to those counterclaims on this ground.

## B. Proximate Cause

Plaintiff next argues that, as to Counterclaims 2-7,[2] there is no admissible evidence that his communications and alleged false statements to the government were the proximate cause of the government's suspension of Vanquish United States. [Doc. 204 at 4]. Plaintiff complains extensively that the Defendants sought a trial continuance to obtain discovery from government officials on this issue, but never made any effort to obtain such discovery after receiving the continuance. [*Id*. at 4-6]. Defendants respond that there is sufficient evidence that Plaintiff was a cause of the suspension, and the law does not require a

---

[2] Because the Court has already concluded that Counterclaims 4, 5, and 7 are barred by the statute of limitations, the Court will not address the arguments as to these Counterclaims relating to proximate cause and damages.

showing that he was the only cause. [Doc. 206 at 15-18]. Plaintiff replies that all of Defendants' evidence is hearsay, and therefore, cannot be considered on summary judgment. [Doc. 211 at 7-8].

The entire argument on this issue is premised on Plaintiff's assertion that, for each of Counterclaims 2-7, Defendants "must prove (1) that Mr. Koshani's actions were the proximate cause of the Government's October 2012 suspension of Vanquish[.]" [Doc. 204 at 4]. However, the Court is not convinced that such a showing is required as to Counterclaims 3 or 6. Specifically, Counterclaim 3 is a claim for misuse of partnership assets, in which Defendants allege that Plaintiff used partnership assets to acquire a license for a sole proprietorship, which he allegedly then used to "try to steal the NAT Contract." [Doc. 75 at 33]. Additionally, as discussed above, Counterclaim 6 relates to an allegation that Plaintiff induced his brother Jawid to breach the NDA between Jawid and Vanquish United States by participating in the alleged scheme to steal the NAT contract. [*Id*. at 35-36]. That Plaintiff's actions were the proximate cause of the government's suspension of Vanquish United States is not a required element for either Counterclaim 3 or 6. Accordingly, the motion for summary judgment on this ground will be denied as to Counterclaims 3 and 6.

Moreover, Counterclaim 2 alleges that Mr. Koshani breached the implied covenant of good faith and fair dealing between himself and Mr. Barton through his actions in which he attempted to "steal the NAT Contract." [Doc. 75 at 32]. Notably, in Tennessee, a claim "based on the implied covenant of good faith and fair dealing is not a stand alone claim; rather, it is part of an overall breach of contract claim." *Cadence Bank, N.A. v. The Alpha*

*Trust*, 473 S.W.3d 756, 773 (Tenn. Ct. App. 2015) (internal quotation marks omitted). Although neither party addresses this issue, the Court is disinclined to believe that a showing that Mr. Koshani's actions were the proximate cause of Vanquish United States's suspension is a required element for Counterclaim 2, which is in essence, subsumed by Counterclaim 1. Accordingly, the motion for summary judgment on this ground will be denied as to Counterclaim 2.

### C. Recoverable Damages

Plaintiff next contends that, as to Counterclaims 2-7, Defendants have already recovered their alleged damages. [Doc. 204 at 8-10]. Plaintiff states that, through an appeal before the ASBCA, involving Vanquish United States's suspension, a settlement was reached and Defendants recovered the full amount of their claim against the government. [*Id*. at 8]. Defendants respond that their ASBCA complaint alleged damages of $31,004,528 plus interest and attorneys' fees, and an additional claim of $6,296,836.77, which they ultimately settled for $30 million, which was less than the total value of the claims. [Doc. 206 at 19]. Plaintiff replies that Defendants' own expert computed the claimed damages as a subcomponent of the $30 million received from the government. [Doc. 211 at 10-11].

As with the argument regarding proximate cause, the entire argument on damages lumps together Counterclaims 2-7 as all claiming damages from Vanquish United States' suspension. However, the Court is not convinced that Counterclaims 2, 3, or 6 are tied to damages from Vanquish United States' suspension. The relevant damages for Counterclaim 3 (misuse of partnership assets) would be the amount of partnership assets

allegedly misused by Plaintiff to obtain a license for a sole proprietorship. Additionally, the relevant damages for Counterclaim 6 (statutory liability for inducement of breach of NDA) would potentially include any penalty for breach of the NDA. Finally, the damages from Counterclaim 2 are tied to the damages from Counterclaim 1, as a claim for breach of the implied covenant of good faith and fair dealing is not a stand-alone claim in Tennessee. *See Cadence Bank,* 473 S.W.3d at 773. Thus, a genuine issue of material fact exists as to whether Defendants sustained any damages relative to Counterclaims 2, 3 and 6, and the motion for summary judgment will be denied on this ground as to those claims.

### D. Failure to State a Claim Under Afghanistan Law

Plaintiff contends that Counterclaims 4-7 fail because they do not state a claim under the governing law, which is Afghan law. [Doc. 204 at 10-12]. Plaintiff states that, under Tennessee law, the law of the state with the "most significant relationship" to the tort is the applicable law. [*Id.* at 10-11]. Plaintiff asserts that Afghanistan has the most significant relationship to the tort claims here, but Afghanistan does not recognize a claim for tortious interference with contract. [*Id.*]. Defendants respond that Tennessee law is the applicable law, because Mr. Barton mostly communicated with Plaintiff from Tennessee, Vanquish United States was paid into a Tennessee bank account, and the injury alleged occurred in Tennessee. [Doc. 206 at 20-22]. Plaintiff replies that the place of injury rule only applies when each state has an almost equal relationship to the litigation, which is not the case here. [Doc. 211 at 12].

Under Federal Rule of Civil Procedure 44.1, "[a] party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In

determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. This Rule, which was adopted in 1966, fundamentally altered the mode of determining foreign law in federal courts by specifying that a court's determination of foreign law must be treated as a question of law, rather than a finding of fact, as had been the prior practice. *Animal Science Prod. Inc. v. Hebel Welcome Pharm. Co.*, 138 S. Ct. 1865, 1872-73 (2018).

Although the Sixth Circuit has not weighed in on the issue, several circuits have held that the party seeking application of foreign law has the burden of proving the relevant legal principles under that foreign law. *See McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 546 (5th Cir. 2012) (referencing the plaintiff's "burden of proving foreign law" and requiring that litigants "present to the district court clear proof of the relevant legal principles" (internal quotations and citations omitted)); *Baker v. Booz Allen Hamilton, Inc.*, 358 F. App'x 476, 481 (4th Cir. 2009) (indicating that the "party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply . . . and the burden of proving foreign law[.]"); *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (3d Cir. 2006) (explaining that, because Rule 44.1 does not impose a duty on courts to conduct independent research into foreign law, the parties "carry the burden of proving" it); *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1321 (11th Cir. 2004) (stating that the district court is not required to conduct research into foreign law if the party urging its application declines to do so); *Esso Standard Oil S.A. v. S.S. Gasbras Sul*, 387 F.2d 573, 581 (2d Cir. 1967) (holding that under the "new Rule 44.1" the plaintiff "still has the task

of persuasion[.]").  On the other hand, the Ninth Circuit has held that imposing such a burden on the parties is contrary to the language of Rule 44.1.  *See de Fontbrune v. Wofsy*, 838 F.3d 992, 998 (9th Cir. 2016) (stating that "[i]mposing a burden of proof on the parties is at odds with the mandate of Rule 44.1.").

This Court finds the majority opinion, that the party seeking to apply foreign law pursuant to Rule 44.1 bears the burden of proving such law, the correct view.  While Rule 44.1 allows the Court to independently research the foreign law at issue, the plain language of the Rule does not impose a duty on the Court to research foreign law where the parties have provided little to no guidance to the Court, as is the case here.  The only evidence of the relevant legal principles under Afghanistan law that Plaintiff has submitted is a brief excerpt of a translated copy of the Commercial Code of the Republic of Afghanistan, produced by Stanford Law School's Afghanistan Legal Education Project.  [Doc. 204-1 at 15-22].  Such document alone, without any testimony or citation to provide context, is insufficient.  Accordingly, the Court finds that summary judgment is inappropriate for this reason.

Moreover, Plaintiff relies on this two-page excerpt of the translated Afghanistan Commercial Code as evidence that no claims for interference with contract or conspiracy exist under Afghanistan law.  However, Article 56 states "[a]ny deception and conspiracy in commercial affairs shall be prohibited[.]"  [Doc. 204-1 at 21].  Without any further context, such provision would appear to support claims for interference with contract and conspiracy.  An actual conflict between Tennessee and Afghanistan law is a necessary predicate to application of Tennessee's conflict-of-law provisions.  *See Hataway v.*

*McKinley*, 830 S.W.2d 53, 55 (Tenn. 1992) (conflict between Arkansas and Tennessee law was a necessary predicate to deciding which state's law should govern); *Wayland v. Peters*, 1997 WL 776338, at *1 (Tenn. Ct. App. Dec. 17, 1997) ("As a preliminary issue to deciding which state law applies, it must be determined whether an actual conflict of law exists"). The Court finds that, given the current record, it is not clear that any conflict exists between Afghanistan and Tennessee law, and the Court will not dismiss any counterclaims on the basis of Afghanistan law. Thus, summary judgment is denied on this alternative ground.

### E. Failure to State a Claim Under Tenn. Code Ann. § 47-50-109

Finally, Plaintiff argues that Counterclaims 5 and 6 fail to state a claim under Tenn. Code Ann. § 47-50-109, because the conduct on which the claims are based did not take place in Tennessee. [Doc. 204 at 12-13]. Defendants respond that the legal doctrine on which Plaintiff's argument is based was overturned, and their counterclaim for statutory inducement is viable. [Doc. 206 at 22-25]. Plaintiff replies that the legal doctrine on which they rely has not been overturned, and was recognized by this Court as late as 2012. [Doc. 211 at 13-14].

Tennessee provides a statutory cause of action for inducement of breach of contract. Tenn. Code Ann. § 47-50-109. In *Telecomm., Eng'g Sales & Serv. Co., Inc. v. Southern Tel. Supply Co.*, the Sixth Circuit held that, under the Tennessee doctrine of *lex loci deliciti*, the alleged wrongs took place in Georgia, not Tennessee, and thus, the Defendant was not liable under Tennessee statutory law. 518 F.2d 392, 394-96 (6th Cir. 1975). Specifically, the Court held that, under the then-applicable statute relating to procurement of a breach of contract, the place where the tort was committed was the state where the acts of

persuasion, misrepresentation, or other means used to induce the breach took place. *Id*. at 395. However, in 1992, the Tennessee Supreme Court concluded that the doctrine of *lex loci delicti* was outmoded, and adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws (1971). *Hataway*, 830 S.W.2d at 57-59. This Court has since applied the most significant relationship test when applying Tennessee conflict of law rules. *See O'Boyle v. Shulman*, No. 3:09-cv-169, 2010 WL 1408444, at *4 (E.D. Tenn. Apr. 4, 2010); *America's Collectibles Network, Inc. v. MIG Broad. Grp., Inc.*, No. 3:06-cv-260, 2008 WL 833521, at *15 (E.D. Tenn. Mar. 27, 2008) (reversed in part on other grounds).

Plaintiff relies on this Court's opinion in *Functional Pathways of Tenn., LLC v. Wilson Senior Care, Inc.*, 866 F. Supp. 2d 918 (E.D. Tenn. 2012) to prove that the *lex loci deliciti* doctrine recognized in *Telecomm., Eng'g Sales & Serv. Co.* remains valid. However, in *Functional Pathways*, this Court merely noted that the parties had agreed that the statutory claim for inducement of breach of contract was barred under *Telecomm., Eng'g & Serv. Co.* 866 F. Supp. at 929-30. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)). Because the parties in *Functional Pathways* did not contest whether the statutory claim for inducement of breach of contract was barred under Tennessee law, the parties waived any such argument. This Court's statement in

*Functional Pathways* is in no way a statement that the *lex loci deliciti* doctrine remains binding law in Tennessee. Accordingly, Plaintiff's reliance on *Functional Pathways* is misplaced.

Because *lex loci deliciti* is no longer the applicable doctrine under Tennessee law, Counts 5 and 6 are not barred by this doctrine, and summary judgment is denied on this ground.

### IV. Conclusion

For the reasons stated herein, the Plaintiff's motion for an extension of time to file a reply [doc. 208] is **GRANTED**, in that the Court has considered Plaintiff's reply brief. Defendant's motion to strike [doc. 212] is **DENIED** as moot, because this Court has not relied on the complained-of evidence in this opinion. Plaintiff's motion for summary judgment [doc. 203] will be **GRANTED** in part and **DENIED** in part. Summary judgment will be **GRANTED** as to Counterclaims 4, 5, and 7, and those claims will be dismissed. Summary judgment will be **DENIED** as to the remaining claims. An order consistent with this opinion will be entered.

   s/ Thomas W. Phillips           
SENIOR UNITED STATES DISTRICT JUDGE
