UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SHAFIQULLAH KOSHANI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-CV-265-TWP-HBG |
| | ) | |
| ERIC WAYNE BARTON and VANQUISH | ) | |
| WORLDWIDE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court are the following Motions:

(1) Plaintiff's Motion to Exclude Proffered Expert Testimony of Mary Anne Osborn and Terry L. Clayton [Doc. 140];

(2) Defendants' Motion to Exclude Expert Testimony of Mr. Jackson [Doc. 151];

(3) Plaintiff's Motion to Seal Exhibits A-S and B-S to His Response to Defendants' Seventh Motion in Limine [Doc. 166];

(4) Plaintiff's Motion to Seal Exhibit A to his Response in Opposition to Doc. 151 [Doc. 173]; and

(5) Plaintiff's Motion to Seal Exhibit B to his Response in Opposition to Doc. 151 [Doc. 180].

The parties appeared before the Court for a motion hearing on February 21, 2019. Attorneys Daniel Marion and Tillman Finley appeared on behalf of Plaintiff. Attorneys Garrett Swartwood and Michael Maloney appeared on behalf of Defendants. The Court heard testimony from Mary Ann Osborn and Jimmy Jackson. Accordingly, for the reasons further explained below,

1

the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Exclude [**Doc. 140**], **DENIES** Defendants' Motion to Exclude [**Doc. 151**], and **GRANTS** the Motions to Seal [**Docs. 166, 173, and 180**].

## I. BACKGROUND

The Court will first discuss the allegations in the Amended Complaint and Defendants' Counterclaims and then turn to the expert witnesses' opinions in this case.

### A. The Pleadings

The Complaint in this case was filed on June 20, 2017, and later amended [Doc. 41] on February 9, 2018. The Amended Complaint states that the action arises from Defendants' refusal to comply with their contractual, fiduciary, and other legal obligations to Plaintiff resulting from a joint venture partnership established by Plaintiff and Defendant Barton to conduct business together in Afghanistan. [Doc. 41 at ¶ 1]. Plaintiff alleges that instead of honoring their commitments and legal obligations to Plaintiff, Defendants acted as if the partnership between Plaintiff and Defendant Barton did not exist and appropriated Plaintiff's contributions and investment in the partnership and all business opportunities in Afghanistan for their own benefit. [*Id.*].

Specifically, the Amended Complaint states that in 2010, Plaintiff and Defendant Barton agreed to form a joint venture partnership to provide services for profit in Afghanistan pursuant to a Joint Venture Agreement ("JVA"), and they registered their business with the Afghan government, calling their company "Vanquish Worldwide" (hereinafter, "Vanquish Afghanistan"). [*Id.* at ¶ 2]. On February 22, 2011, the United States Army issued a solicitation number for National Afghan Trucking ("NAT") services in Afghanistan. [*Id.* at ¶ 20]. The NAT contract was a multiple-award, indefinite-delivery, indefinite-quantity ("IDIQ") procurement,

meaning that the Army would make awards to multiple contractors, each of whom would have the opportunity to be awarded specific task orders or missions under the main NAT contract. [*Id.* at ¶ 22]. The Amended Complaint states that each contract awarded would thus be akin to a hunting license, affording a defined group of prime contractors the opportunity to compete to fill the Government's needs for trucking services in Afghanistan. [*Id.*]. Plaintiff and Defendant Barton agreed that Defendant Barton would prepare and submit a proposal on behalf of their new company, Vanquish Afghanistan. [*Id.* at ¶ 26]. Plaintiff assisted Defendant Barton in preparing the proposal by obtaining information and developing estimates and proposals with respect to pricing, asset requirements, and facility locations. [*Id.*].

The Amended Complaint states that instead of submitting a proposal on behalf of the parties' joint venture partnership, Vanquish Afghanistan, Defendant Barton submitted the proposal for the NAT contract in the name of his own American company with a nearly identical name, Vanquish Worldwide L.L.C, the co-Defendant. [*Id.* at ¶ 3]. The United States awarded the contract to Defendant Vanquish. [*Id.* at ¶ 4]. After Plaintiff discovered the deception, Plaintiff insisted that they proceed with the venture as partners as they had originally agreed. [*Id.*]. Defendants agreed, and the parties signed a Profit Sharing Agreement ("PSA") by which they reiterated their agreement to conduct business operations together in Afghanistan and that all operations would be contracted under the name of the parties' joint venture partnership, Vanquish Afghanistan. [*Id.*]. The Amended Complaint avers that with respect to the NAT contract that had already been awarded to Defendant Vanquish, the PSA expressly provided that all profits under the contract were to be divided 50/50 between Plaintiff and Defendant Barton. [*Id.*].

The Amended Complaint states that after the operation was established and Defendant Vanquish began receiving payments under the contract, Defendants froze Plaintiff out of the

business, they returned to him a portion of the funds that he had invested, and they refused to return the balance of Plaintiff's capital investment and to remit to him his share of the profits obtained from the contract. [*Id.* at ¶ 5].

The Amended Complaint seeks to enforce Plaintiff's rights against Defendants Barton and Vanquish under the parties' JVA, the PSA, and the laws of Afghanistan. [*Id.* at ¶ 6]. Specifically, Plaintiff seeks to recover his share of the profits on the NAT contract and other business opportunities in Afghanistan that Defendants allegedly usurped for themselves in breach of their obligations to Plaintiff, to recover for Defendants' appropriation and use of Plaintiff's substantial investments and contributions to their business operations in Afghanistan, and to obtain an accounting of Defendants' business operations in Afghanistan. [*Id.*]. Plaintiff alleges the following claims: breach of contract, breach of fiduciary duty, conversion, unjust enrichment, equitable accounting, breach of duty of care, breach of duty of loyalty, breach of duty of trust, usurpation of corporate opportunities, breach of the covenant of good faith and fair dealing, an accounting, and a request for punitive damages. [*Id.* at 13–26].

Subsequently, on June 27, 2018, the District Judge dismissed [Doc. 59] Plaintiff's claim that the JVA provided that Defendant Barton must share Defendant Vanquish's profits with Plaintiff or permit Plaintiff to inspect Defendant Vanquish's records.[1] Specifically, the District Judge determined that the JVA pertained to Vanquish Afghanistan and never mentioned Defendant Vanquish. In addition, the District Judge dismissed Count Eleven in the Amended Complaint, wherein Plaintiff alleged that he was entitled to an accounting of all business opportunities with respect to Defendant Vanquish. [Doc. 41 at ¶¶ 119-20]. Plaintiff alleged that he was entitled to such an accounting, not under the JVA or the PSA, but exclusively under the Commercial Code

---

[1] Plaintiff raised these allegations in paragraph 65(b) and (c) of the Amended Complaint.

of Afghanistan. The District Judge disagreed and found that the Commercial Code of Afghanistan does not create a cognizable duty. [Doc. 59 at 17].

Defendants also filed Counterclaims [Doc. 75 at 23] against Plaintiff. Defendants assert that in December 2010, Plaintiff and Defendant Barton entered into the JVA to create a majority Afghan-owned partnership to pursue opportunities, from time to time, in Afghanistan that were set-aside for Afghan-owned entities. [Doc. 75 at 23, ¶ 2]. The JVA states that Plaintiff was the president and 51% owner of the newly-formed Afghan partnership, Vanquish Afghanistan, and Defendant Barton was the vice president and 49% owner. [*Id.* at ¶ 3]. Profits were supposed to be split between Plaintiff and Defendant Barton at the same percentages. [*Id.*]. No specific opportunities were envisioned when the JVA was executed, but the parties intended to identify opportunities that were appropriate for Vanquish Afghanistan as they became available. [*Id.* at ¶ 6].

Defendants allege that when the parties executed the JVA, Defendant Vanquish had existed for three years and that Defendant Barton maintained 100% ownership in Defendant Vanquish. [*Id.* at ¶ 4]. Defendants state that in February 2011, the United States Army issued a solicitation for NAT contracts in Afghanistan, but the NAT contracts were not set aside for Afghan-owned companies. [*Id.* at ¶¶ 7-9]. Defendants state that initially, Defendant Vanquish intended to use a company partially owned by Plaintiff's brother, Farid Koshani, named United Sadat Transportation and Logistics Company ("USC") as the subcontractor, but Farid Koshani indicated that USC was working with another offeror for a prime contract. [*Id.* at ¶¶ 11-12]. Farid Koshani suggested that Defendant Vanquish team with Vanquish Afghanistan as the trucking subcontractor. [*Id.* at ¶ 12]. Defendants state that Plaintiff was copied on the communications

between Defendant Barton and Farid Koshani. [*Id.*]. Defendant Barton agreed to utilize Vanquish Afghanistan as the trucking subcontractor for the bid on the NAT contract. [*Id.* at ¶ 13].

In April 2011, Defendant Vanquish submitted a proposal for the award of a NAT prime contract, wherein Defendant Vanquish was the proposed prime contractor and Vanquish Afghanistan was the proposed trucking subcontractor. [*Id.* at ¶¶ 14-16]. Defendants contend that Plaintiff was aware of the NAT prime contract and the designated prime contractor and the trucking subcontractor. [*Id.* at ¶ 18]. In August 2011, Defendant Vanquish was awarded the NAT contract. [*Id.* at ¶ 19].

Defendants contend that Defendant Vanquish hired Plaintiff's other brother, Jawid Koshani, to serve as Operations Manager under the NAT contract and that Jawid Koshani signed a Confidentiality, Non-Disclosure and Non-Competition Agreement with Defendant Vanquish ("NDA"). [*Id.* at ¶ 23]. Subsequently, Plaintiff refused to allow Vanquish Afghanistan to perform trucking missions and instead stated that Defendant Vanquish should use USC as the trucking subcontractor. [*Id.* at ¶ 25]. The potential prime contractor that USC had submitted a proposal with did not receive a NAT contract award, and therefore, USC was left without a subcontract to perform trucking services. [*Id.* at ¶ 26]. Plaintiff later agreed to use Vanquish Afghanistan for trucking missions as set forth in the NAT proposal but requested that Defendant Vanquish also submit paperwork to include USC as an additional trucking subcontractor. [*Id.* at ¶¶ 28-29]. Defendant Vanquish complied with Plaintiff's request and included USC as an additional trucking subcontractor on the NAT contract. [*Id.* at ¶ 29]. Defendant Barton understood, based on Plaintiff's representations, that Vanquish Afghanistan would perform the trucking services until USC was approved as a subcontractor by the Army, and thereafter, the two trucking subcontractors would split the trucking missions. [*Id.* at ¶ 30].

Defendants state that after the agreement regarding the trucking subcontractors was reached with Plaintiff, on or about September 11, 2011, Plaintiff and Defendant Barton executed a PSA. [*Id.* at ¶ 31]. The PSA revised the parties' prior agreement to split the profits of Vanquish Afghanistan from a 51/49 split to a 50/50 split and further defined the process that they would undertake regarding their roles on future opportunities. [*Id.* at ¶ 32]. Shortly after signing the PSA, the parties signed a Partnership Agreement. [*Id.* at ¶ 33]. Defendants aver that the Partnership Agreement incorporated and superseded all prior agreements, including the JVA and the PSA. [*Id.*].

Defendants state that after the PSA and Partnership Agreement were executed, Defendant Barton learned that Plaintiff did not truly intend for Vanquish Afghanistan to perform any trucking missions. [*Id.* at ¶ 34]. Instead, Jawid Koshani was tasked with distributing missions to the trucking subcontractors after Defendant Vanquish received the trucking missions from the Army. [*Id.*]. Defendants state that rather than splitting the missions between Vanquish Afghanistan and USC as Defendant Barton had assumed, USC was given every trucking mission. [*Id.*]. Defendants aver that, without Defendant Barton's prior knowledge, the Koshanis gave every mission to USC before USC was officially an authorized subcontractor. [*Id.* at ¶ 35].

Defendants aver that as the end of the base period of the NAT contract approached, the United States Army started the process to award the NAT contract holders the first option year, which would commence on or about September 16, 2012. [*Id.* at ¶ 36]. Defendants allege that Plaintiff began making plans to steal the NAT contract and that Plaintiff recruited his brother, Jawid Koshani, to assist him in his scheme. [*Id.* at ¶ 37]. Defendants submit that in or around August 2012, Plaintiff created a new Afghan sole proprietorship under a name similar to Vanquish Worldwide that was 100% owned by Plaintiff and that Plaintiff registered that enterprise with the

Afghan authorities. [*Id.* at ¶¶ 38-39]. In addition, Defendants state that Plaintiff also set up a new Afghan bank account for the sole proprietorship that Plaintiff controlled. [*Id.* at ¶ 40]. Defendants allege that Plaintiff then undertook a scheme, with the help of Jawid Koshani, to make false statements to Government officials in an effort to convince those officials to issue the NAT contract option year to the new sole proprietorship rather than to Defendant Vanquish. [*Id.* at ¶ 40]. Defendants state that the planning and implementation of that scheme by Plaintiff and Jawid Koshani were undertaken with the intent to cause harm to Defendant Vanquish's business through improper and unlawful means. [*Id.* at ¶ 42].

Defendants allege that in 2018, through discovery in this matter, they learned of Plaintiff's attempt to purloin the NAT contract for his own benefit through the use of a new sole proprietorship and bank account. [*Id.* at ¶ 44]. Defendants allege specific steps that Plaintiff and Jawid Koshani took in furtherance of their scheme to steal the NAT contract. [*Id.* at ¶ 45].

Further, Defendants state that Plaintiff and Jawid Koshani requested that the Government award the option year of the NAT contract to them rather than to Defendant Vanquish and that future payments be made to Plaintiff's bank account. [*Id.* at ¶ 46]. Defendants contend that in an effort to hide his ruse, Plaintiff also sent the Army a copy of the Partnership Agreement and indicated that Defendant Barton was a shareholder in the entity. [*Id.* at ¶ 50]. However, Plaintiff was attempting to obtain the option year award using an entity that was 100% owned by Plaintiff. [*Id.*].

Defendants allege that Plaintiff's communications with U.S. Government officials also included false statements on or about September 13, 2012, that Defendant Barton had forged signatures on certain contract documents, had lied to contracting officials, and that the NAT contract should have been awarded to the entity known as Vanquish Afghanistan. [*Id.* at ¶ 51]. In

response to these false allegations, U.S. Government officials stated that they would conduct an investigation into the matter. [*Id.* at ¶ 52]. Plaintiff also reported to officials that Defendant Barton improperly diverted contract payments under the NAT contract and that Defendant Barton falsified records to represent that Defendant Vanquish was an Afghan-owned business. [*Id.* at ¶ 53]. Plaintiff also requested that those officials suspend payments to Defendant Vanquish. [*Id.*].

Defendants allege that as a result of Plaintiff's allegations, the U.S. Government suspended payments to Defendant Vanquish under the NAT contract beginning in October 2012. [*Id.*]. Defendants state that on October 26, 2012, the U.S. Government also suspended Defendant Vanquish from receiving any missions under the NAT contract. [*Id.* at ¶ 54]. Subsequently, the Government officials informed Plaintiff on November 17, 2012, that his allegations concerning Defendants were without merit and rejected his request to make NAT contract payments to him. [*Id.*]. Government officials stated that the United States' "agreement under the NAT contract is with Vanquish Worldwide, LLC, the US Company." [*Id.* at ¶¶ 55-56]. The Government contracting official directed her staff to discontinue further communications with Plaintiff and lifted the suspension on Defendant Vanquish. [*Id.* at ¶ 56-57].

Defendants allege the following claims: breach of contract, breach of covenant of good faith and fair dealing, breach of duty not to misuse partnership assets, tortious interference with contract, statutory liability for inducement of breach of NAT contract, statutory liability for inducement of breach of NDA, and conspiracy.

Subsequently, the District Judge dismissed [Doc. 75] Counterclaims IV, V, and VII based on the expiration of the statute of limitations. Specifically, Counterclaim IV alleged tortious inference with Defendant Vanquish's NAT contract. [Doc. 75 at 33]. Defendants alleged that Plaintiff knowingly provided false information to the U.S. Government regarding ownership of

Defendant Vanquish and that Plaintiff intended to interfere with Defendant Vanquish's performance and ability to compete under the NAT contract. [*Id.* at 34]. Counterclaim IV alleged that Plaintiff succeeded in interfering with the NAT contract because the Government suspended payment of money to Defendant Vanquish. [*Id.*]. Counterclaim V arose out of the same allegations as Counterclaim IV but asserted liability pursuant to Tennessee Code Annotated § 47-50-109. [*Id.* at 35]. Finally, Counterclaim VII alleged a conspiracy between Plaintiff and Jawid Koshani based on the same allegations noted above. [*Id.* at 36-37].

The Court will now turn to the testimony of each challenged expert witness.

**B.      Testimony of the Expert Witnesses**

As mentioned above, Plaintiff has challenged Defendants' experts, Mary Ann Osborn and Terry Clayton. Defendants have challenged Plaintiff's expert, Jimmy Jackson. The three experts' opinions are summarized below.

**1.      Mary Ann Osborn**

Mary Ann Osborn ("Osborn") served for over thirty (30) years as a civil servant with the Department of Defense ("DOD"). [Doc. 141-2 at 3].[2] During that time, she primarily served as a contracting officer, which entailed reviewing and evaluating numerous contract bid proposals ranging from $100,000 to approximately $300,000. [*Id.*]. Osborn renders the following four conclusions in her expert report:

> (1) Vanquish Afghanistan was not a viable prime offeror as it did not meet the eligibility requirements;
>
> (2) Vanquish Afghanistan would not have qualified as a responsible offeror and would not have been eligible for award for either the original NAT RFP due on 8 April 2011 or as a substituted offeror in

_____

[2] The Court notes that Obsorn's report and her testimony at the hearing detail her qualifications for rendering her conclusions. The Court will not summarize her qualifications because Plaintiff acknowledged at the hearing that he has not challenged Osborn's qualifications.

Sept 2012. VW A did not meet all the elements of a responsible offeror mainly under the following guidance from FAR Part 9.104:

(3) Defendant Vanquish was qualified and eligible to receive the optional renewal of the NAT Contract in September 2012; and

(4) Several of Plaintiff's allegations to various government official regarding nonpayment and licensing issues may have led to a suspension which was in the Contracting Officer's authority to issue.

[*Id.* at 5-8].

Osborn testified that in order to form the above opinions, she reviewed several hundred documents that were located in the contracting file in addition to the application regulations. With respect to her first opinion regarding Vanquish Afghanistan's inability to submit a proposal as the prime offeror, she determined that Vanquish Afghanistan was not registered in the mandatory database, which is a requirement to receive the prime contract. She testified that there was no correspondence on behalf of Vanquish Afghanistan in January 2011 when it received a domestic license but not in relation to the NAT contract. She also reviewed the Determination and Findings by the contracting officer in August 2012, stating that Defendant Vanquish was eligible to receive the option.

On cross examination, Osborn was asked about her fourth opinion that Plaintiff's allegations may have led to the suspension. Osborn testified that she believed Plaintiff's allegations led to the suspension because there was a string of emails from Plaintiff alleging nonpayment and other various licensing issues. Osborn stated that the contracting officer raised the same issues that Plaintiff had alleged. Osborn stated that the contracting officer ultimately suspended the contract for licensing issues and suspended payments to Defendant Vanquish, but typically payments are not suspended over a licensing issue. Osborn acknowledged, however, that the contracting officer knows the reasons for the suspension better than she knows and that she

(Osborn) never talked to the contracting officer about the decision. Osborn also agreed that the contracting officer wrote a letter providing the reasons for the suspension. With respect to her opinion that Vanquish Afghanistan would not have been eligible by April 2011, she testified that it did not meet multiple requirements and that it would have had to start working on the requirements much earlier if it wanted to be eligible.

On redirect examination, Osborn testified that when she opined on the suspension, she was specifically addressing the contracting officer's authority to suspend. She stated that the information Plaintiff provided to the contracting officer constitutes a basis for the suspension because the contracting officer must protect assets and ensure performance in order protect the Government.

Finally, the Court questioned Osborn to clarify as to whether she had any discussions with the contracting officer about the suspension. Osborn testified that she did not.

### 2. Terry Clayton

Terry Clayton ("Clayton") has been a professional proposal manager since 1997 and has knowledge with respect to the Government's requirements cited in a request for proposal. [Doc. 141-1 at 3]. Clayton offers one opinion in this case as follows: "It is my opinion that [Vanquish Afghanistan] was not in a position to develop and submit a responsive proposal in its own name by 08 April 2011." [*Id.* at 4]. Clayton states that as of April 6, 2011, Vanquish Afghanistan had not completed the required registrations, which require up to three weeks to complete. [*Id.*]. Further, Clayton submits that as of April 6, 2011, Vanquish Afghanistan was not part of a proposal and was not preparing a proposal of its own for a NAT contract, and therefore, it is improbable that Vanquish Afghanistan could have completed the complex proposal process, locked down subcontractors, and priced the project in time to submit three complete, fully compliant, responsive

proposals by 4:00 p.m. on April 8, 2011. [*Id.*]. She further states that because Vanquish Afghanistan was abruptly and unexpectedly brought onto Defendant Vanquish's team forty-five (45) hours and twenty-four (24) minutes prior to the specified date and time for submission of proposals, there was insufficient time to change the proposal to accommodate a change in prime contractors from Defendant Vanquish to Vanquish Afghanistan. [*Id.*]. Finally, she states that because Vanquish Afghanistan was a newly formed entity that did not have the required credentials and registrations to be found responsible, it was not possible for it to have been awarded a contract on the merits. [*Id.*].

### 3. Jimmy Jackson

Plaintiff retained Jimmy Jackson ("Jackson") as his damages expert. Jackson is the owner of JJ Jackson Consulting, Inc. [Doc. 197 at 1]. He was retained to determine the net income earned by Defendant Vanquish on Afghanistan contracts from 2011 through September 30, 2018. [*Id.* at 5]. Defendants challenge the following conclusions by Jackson:

> 16. The Vanquish Tabulation of "Indirect Costs" included an allocation of $12,744,358.89 for "Federal Income Tax."[4] Vanquish was absolutely wrong to include this as a Vanquish Indirect Cost because Vanquish is a Subchapter S Corporation for Federal Income Tax purposes and consequently does not pay any Federal Income Taxes. Furthermore, I have inspected Vanquish's 2011-2017 Federal Income Tax Returns and Vanquish paid no Federal Income Taxes in any of those years. The $12,744,358.89 is a personal expense of Eric Barton and not a corporate expense of Vanquish. Consequently, it is necessary to eliminate this fictitious expense in the computation of Vanquish's Net Income on Afghanistan Contracts.
>
> 18. Vanquish has included all its legal costs incurred in defending against the current litigation brought by Mr. Koshani against Mr. Eric Barton and Vanquish. This accounting has the perverse impact of having Mr. Koshani pay all his own litigation costs and also paying 50% of the Defendants' litigation costs in this proceeding. Vanquish has recorded $77,336.66 in legal costs as a result of the Koshani litigation, all of which Vanquish charged as direct costs on

the NAT 1.0 Contract. All the Defendants' legal costs for the Koshani litigation must be excluded in the computation of Vanquish's Net Income on the Afghanistan Contracts.

19. There was litigations between United Sadat Transportation and Logistics Company Ltd. ("United Sadat") and Vanquish concerning Vanquish's failure to properly pay its subcontractor on the NAT Contract that ultimately resulted in a negotiated settlement between the parties which also included a personal guarantee by Eric Barton that the settlement agreement payments would be made to United Sadat.

20. The negotiated agreement included terms that under certain conditions the remaining payments would become immediately payable. Eric Barton's divorce judgement represented a condition triggering the requirement for the remaining payments to be made immediately. As a result of Vanquish not paying the remaining payments immediately, United Sadat brought litigation seeking to enforce the promissory note and Eric Barton's guarantee.

21. But for Eric Barton's divorce and the Defendants' failure to make the accelerated settlement agreement payments, there would have been no litigation to force the payments to be made. Vanquish has included the litigation costs for Eric Barton avoiding having to make the accelerated payments. Vanquish has recorded $61,466.89 in legal costs as a result of this United Sadat litigation, all of which Vanquish charged as Direct Costs on the NAT 1.0 Contract. These legal costs should be excluded from Vanquish's costs as they were in reality legal costs of Eric Barton personally.

22. Vanquish recorded a $15,000,000 Subcontractor Service charge to the NAT 1.0 Contract in April of 2018 for "04/2018 LIT SUP-LEGAL FEE" without any indication as to whom this payment will purportedly be made or for what services.[10] Vanquish recorded a $1,452,915.51 Other Direct Costs charge in September of 2018 for "Expected Legal Fees" without any indication as to whom this payment will purportedly be made or for what services or for what litigation matters. Vanquish's corporate representative, CFO Anna Love, was unable to explain the quantification of either of these two (2) amounts at her November 20, 2018 deposition.

23. With these two (2) unsubstantiated 2018 entries, Vanquish essentially eliminated its entire NAT 1.0 profit for the prior eight (8) years. Consequently, these two entries should be excluded in the computation of Vanquish's Net Income on the NAT 1.0 Contract. These non-existent legal costs should be excluded from Vanquish's

costs as there is no basis that future legal costs for the NAT 1.0 Contract will be even remotely close to $16,452,915.51.

24. Vanquish recorded a $10,350,000 Other Direct Cost charge in September of 2018 for "NAT VC3 LIABILITY" without any indication as to the source of this supposed liability. Vanquish's corporate representative, CFO Anna Love, during her November 20, 2018 deposition, testified that VC3, LLC is 100% owned by Eric Barton and only has three (3) employees she could recall: Matthew Naugher, Annie Pentecost, and Eric Barton. Given that transactions between Vanquish and VC3, LLC were not arms-length transactions, Eric Barton was already being compensated by Vanquish, and there being no indication as to avoided costs of having VC3, LLC provide services, it is my opinion that all payments and recorded liabilities to VC3, LLC should be excluded for purposes of determining Vanquish's Net Income on Afghanistan Contracts.

25. Vanquish recorded Other Direct Costs of $12,834,800 for "NAT MB JUDGMENT" recorded in September of 2018. I have searched Vanquish's financial records seeking to identify what "MB" stands for without avail. Vanquish's corporate representative, CFO Anna Love, during her November 20, 2018 deposition testified that "MB" is Michelle Barton and the $12,834,800 payment was for the divorce judgement in Eric Barton's divorce proceeding. The $12,834,800 payment absolutely is not a valid business expense and must be excluded in determining Vanquish's Net Income on Afghanistan Contracts.

27. As shown above, during the first nine months of 2018 Eric Barton paid himself more than ten (10) times what he had paid himself in any other year. Furthermore, he paid himself this dramatically higher partial year 2018 compensation in the same period in which Vanquish putatively lost $19,627,255.76. Consequently, Eric Barton's 2018 compensation was unreasonable and had the impact of artificially reducing the net income of Vanquish. The mechanism by which Eric Barton paid himself his excessive compensation was by a special Direct Labor charge of $2,500,000 charged exclusively to the NAT 1.0 Contract.

29. Vanquish recorded $158,711.10 in Other Income in 2012. Vanquish data detail shows the source of this Other Income as "To write down Koshani Loa[n]." This amount should not have been written down but instead paid to Mr. Koshani in August of 2012 when this write-down occurred. Therefore, I reduced 2012 Other

Income by this amount in the quantification[20] of Vanquish Net Income.

[*Id.* at 7-12].

Jackson testified that he has been in the litigation consulting business since 1984 and that he started his own firm in 1991. [Doc. 215 at 5]. He stated that he has been involved in over one hundred (100) disputes involving government contracts that have been litigated at the United States Court of Federal Claims, as well as the Armed Services Board of Contract Appeals. [*Id.*]. Jackson is not a certified public accountant ("CPA"), but he has three degrees, including two Masters' degrees. Specifically, he has a Master in Finance and a Master of Science Management from Massachusetts Institute of Technology ("MIT"). [*Id.* at 6].

Jackson testified that in this case, he received Defendants' schedule of their purported profits of the Afghanistan contracts in addition to a large Excel workbook that contained their purported financial records. [*Id.*]. Jackson stated that the Excel workbook contained in excess of 160,000 individual transactions during the period of 2011 through September 2018. [*Id.*]. He explained that he made modifications to Defendants' workbook in his report and indicated what adjustments were made. [*Id.* at 8]. He then used Defendants' exact methodology, with the exception of eight questionable transactions, and recomputed the profits on the Afghanistan contracts on a contract-by-contract basis. [*Id.*]. Jackson testified that the key item he relied on was Defendants' workbook but that he also reviewed the pleadings, the deposition testimony of Defendant Vanquish's Chief Financial Officer ("CFO"), and the deposition of Mark Peterson, Defendants' expert. [*Id.* at 10]. He stated that his testimony is based on his experience with respect to how to conduct financial audits. [*Id.* at 10-11]. He testified that he questioned Defendants' transactions on the very basic principal of accounting—that is, the expenses must be ordinary and necessary with respect to conducting business. [*Id.* at 11].

Jackson testified that Defendant Vanquish's federal income taxes were questionable because it filed as a Subchapter S corporation, meaning that it is not required to pay federal income taxes. [*Id.* at 12]. Jackson stated that the income taxes were not recorded on Defendant Vanquish's general ledger system, but instead, recorded on an intermediate summary schedule. [*Id.* at 13]. Jackson stated that federal income taxes is not a proper business expense because it was not included in Defendant Vanquish's general ledger, and it is a personal expense of Defendant Barton. [*Id.* at 13-14]. Jackson stated that counting income taxes as a business expense has the effect of having Plaintiff pay 50% of Defendant Barton's personal income taxes. [*Id.* at 14].

With respect to legal costs, Jackson testified that there is no identification as to what the litigation relates to and that an aspect of accrual accounting is ensuring that there is support for all journal entries in order to estimate future expenses. [*Id.* at 15]. Jackson testified that having support for future costs is a standard part of generally accepted accounting principles ("GAAP"). [*Id.* at 15].

Jackson also reviewed transactions totaling $12.5 million for a company named VC3. [*Id.* at 17]. Jackson stated that Defendant Vanquish's CFO was not able to describe what the company did, although it was owned by Defendant Barton. [*Id.* at 17-18]. Jackson opined that to determine whether an item is an ordinary and necessary business expense, an individual must question the costs to obtain the services elsewhere. [*Id.* at 18]. Jackson stated that there is no possibility that VC3 provided $12.5 million worth of services incurred on a contract that ended more than four years earlier. [*Id.* at 18-19].

Jackson also testified regarding Defendant Barton's compensation, which was recorded as a liability to Defendant Barton but not actually paid.. [*Id.* at 20]. Jackson testified that based on the information he reviewed, there was no logical reason for why Defendant Barton would be paid

a bonus of $2.5 million in Vanquish's worst year during 2011 through 2018. [*Id.*]. Jackson testified that he has significant expertise in the area of federal government contractor compensation and determining the reasonableness of such compensation. [*Id.* at 20-21]. He explained that he was accepted as an expert by the Armed Services Board of Contract Appeals in a case and that he has been involved in dozens of defense contracting agency audits of executive compensation with respect to federal government contractors. [*Id.* at 21]. He testified that he is also familiar with the statutory rules on what is deemed to be reasonable compensation and that he is knowledgeable about the D.C. Audit Agency ("DCAA") approach on determining whether executive compensation is reasonable. [*Id.*]. He testified that pursuant to the statutory rules for 2018, the cap on pay for executive compensation is $525,000. Further, he opined that if Defendant Barton were allowed to determine what he would like to pay himself as a bonus, then he could effectively, under the PSA, pay all profits to himself. [*Id.* at 22-23]. Jackson determined that the $2.5 million bonus was charged exclusively to the NAT 1.0 contract. [*Id.* at 23]. Jackson said that he also identified a $12.8 million recorded item as part of Defendant Barton's divorce judgment, which should not have been recorded as a business expense incurred by Defendant Vanquish. [*Id.* at 23-24].

Jackson testified that the cumulative effect of the above expenses that were attributed to the NAT contract changed the NAT contract from being a highly-profitable contract to a loss contract. [*Id.* at 25]. Jackson testified that the effect was to dramatically understate the profitability of the Vanquish contracts for worked performed in Afghanistan. [*Id.* at 26].

On cross examination, Jackson confirmed that he is not a CPA but testified that he performed accounting services in the instant matter and that he has provided opinions about accounting in other proceedings. [*Id.* at 28]. Jackson acknowledged that he did not cite to GAAP

in his expert report. [*Id.*]. Jackson stated that his opinions were also based on IRS regulations in general and that those citations were not in his report. [*Id.* at 28-29]. He testified that he did not provide specific citations for some conclusions because they are based on principles that are intuitively obvious, and therefore, he did not cite detailed authority for such principles. [*Id.* at 29].

Jackson testified that he has submitted hundreds of expert witness reports and that some reports were prepared for the Armed Services Board of Contract Appeals, the General Services Administration Board of Contract Appeals, and the United States Court of Federal Claims. [*Id.* at 31-32]. He has prepared twenty to thirty reports in relation to proceedings before federal district courts. [*Id.* at 36]. He testified that in one case, a judge granted a motion in limine to exclude him from a proceeding, but the judge was unaware that he had already resigned from that case. [*Id.* at 50]. In another case, the judge found that his opinion was not admissible because the attorney could have prepared the computations and calculations. [*Id.* at 52]. In other instance, Jackson had to amend his report because he "overstepped [his] boundary." [*Id.*].

Jackson testified that he reviewed the pleadings and the PSA, but because he did not rely on those documents in forming his opinions, he did not provide citations to them in his expert report. [*Id.* at 52-53]. With respect to Defendant Barton's compensation, he testified that it was unreasonable and should be excluded because the compensation was ten times more than the amount that Defendant Barton was paid in the previous years. [*Id.* at 54]. He also stated that there was a lack of support for the compensation, but that reason was not included in his report. [*Id.*]. He testified that the statutory cap of $525,000 was placed on compensations by Congress. [*Id.* at 55]. He explained that the cap limits the amount that is deemed to be reasonable compensation for federal government contracts. [*Id.*]. He acknowledged that the cap was not referenced in his report, but he relied on the cap and his understanding as to how the statutory provisions are applied

to the thousands of DCAA audits every year.  [*Id.* at 56].  He stated that the statutory cap is cited

on a website page on the White House's website.  [*Id.* at 56-57].  He acknowledged that the

particular website page does not use the word "reasonable."  [*Id.* at 57].  He claimed that the cap

is not just for reimbursements, but it is also used in determining rates for existing, as well as

proposed contractors.  [*Id.* at 58].  He stated that Defendant Barton's compensation entry was

recorded on September 30, 2018, and at that time, Defendant Vanquish would not have been

submitting a request for future GNA rates.  [*Id.* at 59].

## II.     POSITIONS OF THE PARTIES

The Court will summarize the parties' positions with respect to their *Daubert* filings.

### A.      Plaintiff's Motion to Exclude Proffered Testimony of Mary Anne Osborn and Terry L. Clayton [Doc. 140]

Plaintiff moves [Doc. 140] to exclude the testimony of Defendants' retained experts,

Osborn and Clayton.  As mentioned above, Osborn spent thirty (30) years as a contracting officer

with the DOD, and Clayton is a professional proposal manager.

With respect to Osborn, Plaintiff challenges all four of her opinions.  First, Plaintiff

challenges Osborn's opinion that "the allegations of nonpayment and licensing issues to various

government personnel may have led to a suspension which was in the Contracting Officer's

authority to issue."  Plaintiff submits that Osborn does not identify or apply any methodology.

Plaintiff argues that even if Osborn identified a methodology, her opinion does not acknowledge

that the contracting officer stated the reasons for her decision to suspend Defendant Vanquish and

the reasons for lifting the suspension.  Plaintiff asserts that Osborn's causation opinion is

speculative.

In addition, Plaintiff asserts that Clayton's opinion and Osborn's remaining three opinions

are irrelevant in this case.  Specifically, Clayton opines that Vanquish Afghanistan "was not in a

position to develop and submit a responsive proposal in its own name by April 8, 2011." Osborn opines as follows: (1) Vanquish Afghanistan was not a viable prime offeror as it did not meet the eligibility requirements, (2) Vanquish Afghanistan would not have qualified as a responsible offeror and would not have been eligible for either the original NAT Request for Proposal due on April 8, 2011, or as a substituted offeror in September 2012, and (3) Defendant Vanquish was qualified and eligible to receive the option renewal on the NAT contract in September 2012. Plaintiff submits that none of the above opinions are relevant to the issues in this case, which include whether Defendant Barton breached the September 2011 PSA, whether Defendant Barton violated his duties to Plaintiff, or whether Defendant Barton unjustly enriched himself at Plaintiff's expense. Finally, Plaintiff argues that Clayton's and Osborn's testimony cannot be a vehicle for the presentation of hearsay evidence and that many of the documents that they purport to rely on constitute inadmissible hearsay.

Defendants respond [Doc. 175] that Osborn's and Clayton's opinions satisfy the requirements of Federal Rule of Evidence 702 and the dictates in *Daubert*. First, with respect to Osborn's opinion regarding a reasonable contracting officer's reaction to Plaintiff's allegations, Defendants contend that Osborn utilized a methodology to assess the question presented to her that was consistent with the practices a contracting officer would undertake in evaluating an issue of contract administration. Defendants argue that Osborn's expertise is in evaluating a federal contract's terms and the applicable Federal Acquisition Regulations ("FAR") in order to determine the obligations of the contractor vis-à-vis the authority and reasonable actions of the contracting officer administering the contract. Defendants argue that Osborn utilized her vast experience as a former DOD contracting officer to opine on the reasonable and expected actions of the NAT contracting officer after receipt of Plaintiff's allegations. Further, Defendants assert that Osborn's

opinion is firmly based on admissible facts. In addition, Defendants argue that Osborn's remaining opinions and Clayton's opinion are relevant to the issues presented in this case. Defendants contend that their testimony will determine the plausibility of Plaintiff's narrative and the true intentions of the parties. Finally, Defendants argue that Osborn and Clayton rely on proper documents in forming their opinions.

Plaintiff filed a Reply [Doc. 194], asserting that Osborn's opinion as to causation is indefinite speculation. In addition, Plaintiff maintains that Osborn and Clayton's opinions regarding Vanquish Afghanistan's eligibility to be awarded the NAT contract are irrelevant. Plaintiff argues that such opinions have nothing to do with the PSA or Defendants' Counterclaims. Finally, Plaintiff states that Osborn's and Clayton's anticipated testimony is inadmissible hearsay in the guise of expert opinions.

### B.  Defendants' Motion to Exclude or Limit Expert Testimony [Doc. 151]

Defendants request [Doc. 151] exclusion of Plaintiff's damages expert, Jackson. Defendants have raised challenges to several specific opinions by Jackson, stating such opinions will not assist the jury. In addition, Defendants argue that Jackson's opinions are not grounded in reliable methodology and that there is not a proper fit between the facts of this case and his opinions.

Plaintiff responds [Doc. 179] that Defendants mischaracterize Jackson's review of this matter, which was to analyze the financial statements and records produced by Defendant Vanquish. Plaintiff submits that Defendants' expert, Mark Peterson, does not dispute Jackson's conclusions and affirmatively agrees with some of Jackson's opinions. Plaintiff argues that Jackson's opinions are grounded in reliable methodology and analysis. With respect to

Defendants' argument that Jackson's opinion does not fit the facts of this case, Plaintiff contends that Defendants raised the same arguments in their dispositive motions, which the Court denied.

Defendants filed a Reply [Doc. 192], maintaining that Jackson did not identify any methodology and did not appear to use a methodology. Defendants state that Jackson's report violates Federal Rule of Civil Procedure 26(a)(2)(B)(ii) because he does not identify a methodology used in his review.

## III.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)). Specifically, Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid.. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir.1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## IV. ANALYSIS

Guided by the foregoing, the Court will consider the parties' challenges to the experts' testimony. The Court will then turn to the Motions to Seal.

### A. *Daubert* Challenges

The Court will first address Plaintiff's challenges to Osborn's and Clayton's opinions. Next, the Court will address the challenges to Jackson's opinion.

#### 1. Mary Osborn

As mentioned above, Plaintiff challenges Osborn's opinions, arguing that they are speculative and irrelevant. Specifically, Plaintiff challenges Osborn's opinion that Plaintiff's "allegations of nonpayment and licensing issues to various government personnel may have led to a suspension which was in the contracting officer's authority to issue." Plaintiff states that Osborn does not identify or apply a methodology and that the contracting officer stated the reasons that

caused her to suspend Defendant Vanquish and to later lift the suspension.  In addition, Plaintiff

asserts that Osborn's opinion is speculative because she opines that such allegations *may* have led

to a suspension or what *might* be expected.  Defendants respond that Osborn's opinion regarding

a reasonable contracting officer's reaction to Plaintiff's allegations are admissible.

The Court finds Osborn's opinion that Plaintiff's allegations of nonpayment and licensing

issues to various government personnel may have led to a suspension, which was in the contracting

officer's authority to issue, not helpful to the jury because it is speculative.  *See* Fed. R. Civ. P.

702 (requiring that expert witness testimony be helpful to the trier of fact).  The Court agrees with

Plaintiff in that Osborn's opinion constitutes an attempt to explain the basis for another person's

actions.  *See generally Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.

N.Y. 2005) (explaining that testimony consisting of inferences that the expert draws from the

evidence is inadmissible speculation).  Instead of asking the contracting officer why she suspended

payments to Defendant Vanquish, Defendants attempt to use Osborn to opine why the contracting

officer suspended Defendant Vanquish.  Accordingly, the Court finds Osborn's opinion not helpful

to the jury as required pursuant to Rule 702.

At the *Daubert* hearing, Defendants argued that Osborn's opinion is broader than how

Plaintiff has characterized and that Osborn's opinion relates to the contracting officer's authority

to suspend based on such allegations.  Defendants emphasized that Osborn is not testifying as to

what the contracting officer thought, but instead, Osborn is testifying as to the contracting officer's

authority in relation to government contracting.  Even if Osborn's opinion is construed as

Defendants have suggested, the Court finds that whether the contracting officer had authority to

suspend irrelevant to the issues in this case.  The issues relating to Plaintiff's allegations to

government officials are (1) whether Plaintiff actually made false allegations, (2) whether such

allegations were made in an attempt to steal the NAT contract, and (3) whether such allegations led to Defendant Vanquish's suspension. Whether the contracting officer had the authority to suspend (which does not appear to be in dispute) is irrelevant as to whether the suspension actually occurred (which, again, does not appear to be in dispute) and whether the suspension was because of Plaintiff's allegations (which is in dispute). Expert testimony is not necessary or helpful as to these issues. Accordingly, Plaintiff's argument is well taken with respect to Osborn's fourth opinion.

In addition, Plaintiff asserts that Osborn's remaining three opinions are not relevant to the issues in this case. Specifically, Osborn opines that (1) Vanquish Afghanistan was not a viable offeror in April 2011 for the initial request for proposal on the NAT contract, (2) Vanquish Afghanistan was not a responsible offeror for the original NAT request for proposal in April 2011 or a substituted offeror in September 2012, and (3) Defendant Vanquish met the test of responsibility for the optional renewal in 2012. The Court will address these opinions separately.

With respect to Osborn's first opinion (i.e., Vanquish Afghanistan was not a viable offeror in April 2011 for the initial request for proposal for NAT), Plaintiff asserts that it is not relevant to the issues in this case. Plaintiff argues that this opinion has nothing to do with whether Defendant Barton breached the September 2011 PSA, whether he violated his duties to Plaintiff, and whether he unjustly enriched himself at Plaintiff's expense.

Defendants respond that one of the most hotly, contested issues in this case concerns the formation of Vanquish Afghanistan and the parties' intentions with respect to the PSA. Defendants argue that Plaintiff contends that the JVA was executed in order to pursue business together, including the NAT contract. Defendants assert that Plaintiff's theory is that Defendant Barton submitted the proposal in the name of Defendant Vanquish as opposed to submitting the proposal

naming Vanquish Afghanistan as the prime contractor pursuant to the JVA. Defendants assert that both experts have experience and knowledge as to the eligibility requirements and will assist the jury in understanding the plausibility of Plaintiff's narrative in this case.

The Court notes that in Plaintiff's Amended Complaint, he alleges that Defendant Barton breached the JVA by "[f]ailing to conduct business in Afghanistan through is joint venture partnership with Plaintiff, including by submitting the proposal for and obtaining and performing the NAT contract in the name of Defendant Vanquish Worldwide L.L.C., rather in the name of the partnership and doing likewise with respect to other business opportunities, including the NAT 1.5 and NAT II contracts." [Doc. 41 at 13]. He also alleges that he assisted Defendant Barton in preparing the proposal by obtaining information and developing estimates and proposals with respect to pricing, asset requirements, and facility locations. [*Id.* at 6]. Given that Plaintiff has specifically alleged that pursuant to the JVA, the parties intended on using Vanquish Afghanistan as the prime contractor on the NAT contract and Plaintiff assisted in preparing the proposal, the Court will allow Osborn to testify as to the eligibility requirements and whether Vanquish Afghanistan was a viable prime offeror in April 2011. The parties have alleged contrary intentions with respect to how Vanquish Afghanistan was to operate, and the Court finds Osborn's testimony regarding the steps necessary to be a viable prime offeror relevant. Plaintiff asserts that Osborn's testimony does not establish that he knew that the partnership could not submit a responsive proposal or undermine his claim that he did not learn of Defendant Barton's misconduct until August 2011. Plaintiff, however, can testify to that during the trial.

With respect to Osborn's second opinion (i.e., Vanquish Afghanistan was not eligible as a substituted offeror in September 2012), Plaintiff asserts that this opinion is also irrelevant for the same reasons that he argued Osborn's first opinion is irrelevant. Defendants respond that Osborn's

second opinion is relevant because it supports Defendant Barton's testimony that he never agreed with Plaintiff to substitute Vanquish Afghanistan as the prime contractor in September 2012 or at any time. Plaintiff replies that this argument is irrelevant.

At the *Daubert* hearing, Plaintiff argued that Osborn's opinions regarding eligibility or ineligibility were irrelevant because Plaintiff has narrowed his claim to the enforcement of the PSA. The Court notes, however, that in this case, Plaintiff has taken the position that in 2012, he contacted government officials to request that they update the contracting information under which the parties' partnership had operated as the prime contractor during the case year and would continue to do so during the option period. *See also* [Doc. 41 at ¶ 38] (Amended Complaint) (alleging that when the parties agreed to enter the PSA, they also agreed that all operations would be conducted under Vanquish Afghanistan's name). Given Plaintiff's position, the Court will allow Osborn to testify as to whether Vanquish Afghanistan was eligible in 2012.

Finally, Osborn opines that Defendant Vanquish was eligible for the option award in 2012. Plaintiff also challenges this opinion on relevancy grounds for the same reasons as set forth above. Defendants argue that Plaintiff has made Osborn's opinion relevant. Specifically, Defendants contend that Plaintiff has taken the position in this case that Defendant Barton benefited from Plaintiff getting the transportation license from AISA in September 2012. Defendants state that they can refute this assertion by pointing to other facts in the record. In addition, Defendants state that they will cite to records showing that a transportation license was not required from the United States' companies in order to be eligible. Defendants explain that they "intend to use Ms. Osborn's testimony to assist the jury to understand what the U.S. Government contracting officials did and what it meant." [Doc. 175 at 16].

The Court finds that Defendants have not established how Osborn's opinion is relevant to the issues in this case. Plaintiff acknowledges in his Amended Complaint that Defendant Vanquish "proceeded from the base year of the prime contract into the first option year awarded by the Army." [Doc. 41 at 11]. Further, Defendants acknowledge that they can refute Plaintiff's assertion that Defendants benefited from the license by showing that "the sole proprietorship's license was never submitted to the U.S. Government on behalf of Vanquish-US. (In fact, Mr. Barton was never given a copy of the sole proprietorship's license.)." [Doc. 175 at 16]. Defendants also state that they will "cite to records showing that a transportation license was not required from the U.S. companies to be eligible." [*Id.*]. Thus, it appears to the Court that Osborn's opinion is not helpful or necessary. Further, Defendants' use of Osborn's testimony (i.e., to attest what an individual did and what it meant) is not in accordance with Rule 702 for the same reasons the Court has excluded her opinion regarding Plaintiff's allegations to the contracting officer. Accordingly, the Court finds Plaintiff's argument well taken with respect to Osborn's opinion that Defendant Vanquish was eligible for the option award in 2012.

Plaintiff also argues that Osborn (and Clayton) rely on inadmissible evidence and that Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when the expert adds nothing to the out-of-court statement. Plaintiff asserts that Defendants have no admissible evidence that anything Plaintiff said or did was the proximate cause of the suspension on October 26, 2012. Plaintiff asserts that Defendants should not be permitted to manufacture testimony using purported experts as a channel by which to present inadmissible hearsay statements, nor should they be able to present the jury with inadmissible hearsay on any other point through experts. Defendants asserts that Osborn (and Clayton) rely on proper documents and that the vast majority of documents that form the basis of the opinions are non-

hearsay and constitute business records. In addition, Defendants state that Rule 703 permits experts to rely on the type of data that is reasonably relied upon in the expert's field.

As an initial matter, the Court notes that Plaintiff does not object to any specific document, but instead, provides citations to the pages wherein the experts list what documents that they rely on. Further, it appears to the Court that Plaintiff's primary concern is Osborn's reliance on documents for her opinion that Plaintiff's allegations may have led to the suspension. The Court, however, has excluded this opinion. With respect to the opinions that the Court has allowed, the experts have discussed the relevant regulations and rules to determine eligibility, and the other documents that they rely on, as Defendants have asserted, appear to be documents that contracting officers use to determine who should be awarded a contract. *See* Fed. R. Evid. 703 (explaining that the facts or data need not be admissible in evidence if they are the type that experts reasonably rely on). Accordingly, the Court finds Plaintiff's argument not well taken on this point.

### 2. Terry Clayton

Plaintiff also challenges Clayton's opinion on the basis that it is not relevant. Similar to Osborn's opinion, Clayton opines that Vanquish Afghanistan was not in a position to develop and submit a proposal in its own name in April 2011. Accordingly, for the same reasons the Court will not exclude Osborn from testifying to such an opinion, the undersigned declines to exclude Clayton's opinion.

### 3. Jimmy Jackson

As mentioned above, Defendants challenge Jackson's opinions, arguing that they will not assist the jury, they are not grounded in reliable methodology, and there is not a proper fit between the facts of this case and his opinion. Further, Defendants argue that Jackson did not properly disclose his opinion pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). Plaintiff responds

that Defendants mischaracterize what Jackson did in this case and that Jackson's report complies with the expert disclosure requirements.

The Court will first discuss whether Jackson's report complies with Rule 26(a)(2)(B) and then turn to Defendants' substantive objections to Jackson's opinion.

At the *Daubert* hearing, Defendants asserted that their primary challenge to Jackson's report is that he failed to cite the facts or data he considered in forming his opinion. Defendants argued that GAAP provides guidance for accounting methods and that he failed to mention GAAP in his report. Defendants assert that Jackson's report should be excluded for violating Rule 26(a)(2)(B) and that exclusion is automatic pursuant to Rule 37(c). Plaintiff responded that the cases Defendants rely on for exclusion are different than the instant matter and exclusion is not automatic under Rule 37(c).

Rule 26(a)(2)(B) provides, in relevant part, that expert witness disclosures "must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony." Rule 26(a)(2)(B) requires that the expert report contain "the facts or data considered by the witness in forming" the opinion. Rule 37(c)(1) provides, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Both parties discussed the Sixth Circuit's decision in *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010) during the *Daubert* hearing. In *R.C. Olmstead*, the Sixth Circuit affirmed the district court's decision to exclude plaintiff's expert because the expert's report did not comply with Rule 26(a)(2)(B). *Id.* at 271-72. The Sixth Circuit stated that the expert's "two-page report did not meet Rule 26(a)(2)(B)(i)'s requirement that an expert report be 'a complete

statement of all opinions that the witnesses will express and the basis and reasons for them.'" *Id.* at 270 (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)).  Instead, the expert only provided "cursory support for his conclusion" that the software at issue was developed by copying plaintiff's software.  *Id.* at 271.  The Court reasoned that after reading the expert's report, defendant "was only slightly more informed about the basis of [plaintiff's] argument" than defendant "would have been by merely reading [plaintiff's] complaint."  *Id.*  The Court noted, "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."  *Id.* (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998)).  The Court held that the expert's report "plainly failed this hurdle" and that exclusion was appropriate because plaintiff never argued that the failure to properly disclose was substantially harmless or justified before the district court.  *Id.*

The Court does not find that Jackson's expert report suffers from the same deficiencies as the expert's report in *R.C. Olmstead*.  In this matter, Jackson was tasked with determining Defendant Vanquish's net income on the Afghanistan contracts from 2011 through 2018.  He provides an opinion with respect to Defendant Vanquish's net income and discusses how he arrived at this number.  Defendants assert that Jackson's expert report does not identify the facts and data considered by him in forming the opinions.  Jackson outlines the "facts and data" he considered in paragraphs 9 through 12 of his expert report.  Specifically, Jackson states as follows:

> 9. Defendant Vanquish Worldwide, L.L.C.'s Second Amended Supplemental Response to Plaintiff's Second Set of Interrogatories, dated November 9, 2018, specified in response to Interrogatories 11, 12, 13, and 14: Defendant further supplements this response as follows: As to "any other business, projects, grants or other work in or relating to Afghanistan from December 2010 to the present," Vanquish's books show the total revenues and expenses under those projects as detailed in the attached Addendum, which is marked as "Outside Counsel Eyes Only" pursuant to the Court's Protective Order. Defendant has categorized the costs under those contracts to

the best of its ability, solely for purposes of this discovery response. All of the costs in each of the categories in the Addendum also are included in the document identified as Bates no.KOSH_00031039, which was produced to plaintiff's counsel on November 5, 2018.

10. Attached to the same legal filing was a one page "Vanquish Tabulation," but without any detail as to how the amounts were derived. On November 19, 2018, Vanquish produced the Excel workbook entitled "VW Consolidated Project Financials 2011-2018" that produced the Vanquish Tabulation

11. My quantification started with the "VW Consolidated Project Financials 2011-2018" Excel workbook which I modified by modifying formula, adding spreadsheets, eliminating certain Vanquish accounting entries, and correcting for Vanquish linking to other Excel files. I describe these changes throughout my report.

12. Before commencing with the detail quantification, it is beneficial to review Vanquish's assertions as to Vanquish's Net Income on Afghanistan Contracts. Their interrogatory exhibit, "Vanquish Tabulation", reported the following Net Income by Afghanistan contract . . .

[Doc. 174 at 5-6]. The above items are the "facts or data" Jackson relied on in forming his opinion.

Defendants' complaint is that Jackson did not provide citations in his report to GAAP. The Court, however, does not find that the lack of citations to GAAP is fatal to Jackson's opinion. A similar argument was addressed by the Sixth Circuit in *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201 (6th Cir. 2006). In *Thompson*, the Court reversed the district court's decision to exclude the CPA's opinion because he did not cite to GAAP in his expert report. *Id.* at 1201. The Court held that its "independent research did not disclose case authority for the position that a CPA's expert testimony is barred because he did not expressly use the magic words 'based on generally accepted accounting principles.'" *Id.* at 1203. In discussing the district court's decision, the Sixth Circuit concluded, "We find no precedent or reasoning supporting such a mechanical and formalistic reading of the ruling." *Id.*

In his report, Jackson explained that he relied on the above facts to determine net income and in doing so, he discovered several questionable transactions that, in his opinion, should not have been recorded as expenses of Defendant Vanquish and had the effect of reducing profits. Notably, Jackson testified that he relied on his experience on how to conduct financial audits. *Elam v. Menzies*, No. CIV.A. 6:07-253-DCR, 2010 WL 1334557, at *3 (E.D. Ky. Mar. 30, 2010) (explaining that the Sixth Circuit has determined that absent an alternative convention, it can be assumed that an expert relied on the normal general standards of their profession) (citing *Thompson*, 470 F.3d at 1203). [3]

The Court has also considered Defendants' remaining objections, and the Court declines to exclude Jackson from testifying in this matter. Defendants object to Jackson's opinions, arguing that he did not cite to any methodology, rule, or regulation. As stated above, Jackson relied on his experience and knowledge in conducting his review of this case and the lack of citing to a specific rule is not fatal to his opinions. Jackson performed an accounting of Defendant Vanquish's financial records and concluded that there were certain questionable items. The Court finds that his testimony will assist the jury in understating the alleged damages in this case.

Defendants also submit that Jackson's opinion with respect to how federal income taxes were recorded amounts to a legal conclusion. The Court disagrees. Jackson explained that he inspected Defendant Vanquish's income taxes from 2011 to 2017 and that it did not pay taxes, and

---

[3] Defendants have not challenged Jackson's qualifications in this matter. In any event, the Court notes that Jackson earned his Bachelor of Science in Management degree from MIT in 1970 with a specialization in mathematical modeling, a Master of Business Administration degree from Southern Illinois with a specialization in finance, and Master in Science Management degree with a specialization in modeling and finance. [Doc. 174 at 1]. During his last seven years, he has been the director of worldwide advanced quantitative analysis within the litigation services practice with responsibility for developing standards and practices for quantifying damages in litigation proceedings. [*Id.* at 2].

therefore, it was inappropriate to include an allocation on the expense sheet for federal income taxation. If Defendants disagree, they can cross examine Jackson on this point.

Finally, the Court agrees with Plaintiff that Defendants' argument that Jackson's opinion does not fit the facts of this case is a repetition of their arguments made in the dispositive filings, which the District Judge denied. Accordingly, the Court finds Defendants' request to exclude Jackson's opinion not well taken.

### B.     Motions to Seal

Plaintiff filed three Motions to Seal [Docs. 166, 173, and 180]. In the first Motion, Plaintiff seeks to seal Exhibits A-S [Doc. 167] and B-S [Doc. 168] to its response to Defendants' Seventh Motion in Limine. Plaintiff states that Exhibit A-S is the expert report of Mark Peterson, Defendants' expert, and that Exhibit B-S is the second report by Jimmy Jackson. Plaintiff states that he is filing such documents under seal because in both expert reports, they rely on information that Defendants have designated as "outside counsel eyes only."

The second Motion [Doc. 173] requests that the Court seal Exhibit A-S [Doc. 174], which was filed in opposition to Defendants' Motion to Exclude Jimmy Jackson. Exhibit A-S is the expert report of Jimmy Jackson. Plaintiff states that he does not believe that there is a basis for sealing but that the documents Jackson relied on were deemed "outside counsel eyes only" by Defendants.

With respect to Plaintiff's third Motion [Doc. 180], Plaintiff requests to file under seal Exhibit B-S [Doc. 181], which was filed in opposition to Defendants' Motion to Exclude Jimmy Jackson. Exhibit B-S is portions of Mark Peterson's deposition. Plaintiff states that he believes that there is no basis for sealing, but Defendants have marked the deposition as "outside counsel eyes only."

Defendants filed a Consolidated Response to Plaintiff's Motions [Doc. 196]. In their Consolidated Response, Defendants request that the Court permit the following documents be filed under seal: Peterson's expert report [Doc. 167], Jackson's second report [Doc. 168], and Jackson's original report [Doc. 174]. In addition, Defendants state that Plaintiff filed excerpts of Peterson's deposition [Doc. 181], and Defendants do not object to releasing the information that was cited in Plaintiff's memorandum. Defendants state that they seek only limited sealing and that they have submitted proposed redacted versions of the exhibits. Defendants state that they seek to protect Defendant Vanquish's privacy rights and its trade secrets in its own financial data. Defendants assert that this case centers on a contract dispute between two private individuals, and therefore, is not of great public interest. Defendants argue that the information at issue here is Defendant Vanquish's financial information taken from its financial records that were produced to Plaintiff in discovery pursuant to the Stipulated Protective Order. Defendants assert that their financial records constitute "trade secrets" pursuant to the Tennessee Uniform Secrets Act.

Defendants assert that its financial data is valuable to Vanquish and to its competitors. Defendants explain that the financial information contained in the two Jackson reports and the Peterson report would allow competitors to easily "reverse engineer" Defendant Vanquish's indirect rates and anticipate the prices that it will bid on future proposals. Defendants fear that this would give its competitors an enormous competitive advantage because it would also allow them to price their own proposals below Defendant Vanquish's prices.

With respect to Jackson's report, Defendants state that they have made minor redactions to the body of Jackson's report, including (1) redacting a chart showing Vanquish's asserted net income by Afghanistan contract, (2) chart showing Defendant Barton's compensation, and (3) a chart showing the corrected net income on Afghanistan contracts.

With respect to Jackson's report, Defendants state that they have made the following redactions: (1) Vanquish's 2018 NAT 1.0 Net Income, (2) chart showing NAT 1.0 Revenue by period, (3) chart showing allocated corrected net income on the Afghanistan contracts, (4) its damages, and (5) chart of Plaintiff's damages plus prejudgment interest.

With respect to Peterson's report, Defendants state that they have redacted the following information: (1) total net income for Afghan work through September 30, 2012, (2) suspension damages, and (3) potential diverted profits.

Defendants assert that they have concerns that there may be an improper purpose at play here. Defendants argue that Plaintiff made improper comments in his Motions to Seal that such secrets should not be sealed. Further, Defendants note that Plaintiff's counsel represents several of Vanquish's competitors. Defendants are concerned that there might be a leak to those sensitive records to Vanquish's competitors and that Defendants believe that the Protective Order was violated. Finally, Defendants state that Plaintiff included claims in the Amended Complaint but then later dropped such claims after receiving Defendant Vanquish's financial information. In support of their Consolidated Response, Defendants have submitted the Declaration of Anna Love, the CFO for Defendant Vanquish, and Gregory Guiney, the Executive Vice President for Defendant Vanquish.

Local Rule 26.2 provides as follows: "Except as otherwise provided by statute, rule, or order, all pleadings and other papers of any nature filed with the Court . . . shall become a part of the public record of this Court." E.D. Tenn. L.R. 26.2(a). In order to seal any part of the record, a party must show good cause. E.D. Tenn. L.R. 26.2(b). In this District, discrete redacting of documents or selective sealing is generally preferred over the wholesale sealing of documents. *See* E.D. Tenn. L.R. 26.2; E.D. Tenn. ECF R & P at § 12; *see also PPG Inc., v. Payne*, No. 3:10-CV-

73, 2010 WL 2158807 (E.D. Tenn. May 25, 2010) and *In re Southeastern Milk Antitrust Litig.*, 666 F. Supp. 2d 908, 912 (E.D. Tenn. 2009).

The Sixth Circuit reiterated that "courts have long recognized . . . a 'strong presumption in favor of openness' as to court records." *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F. 3d 299, 305 (6th Cir. June 7, 2016) (quoting *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983)). The Sixth Circuit continued that the burden of overcoming the presumption is a heavy one and that the "proponent of sealing . . . must 'analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.'" *Id.* (quoting *Baxter Int'l, Inc., Abbott Labs.,* 297 F.3d 544, 545 (7th Cir. 2002)).

The Court has considered Defendants' reasons for placing the documents under seal and finds good cause to place them under seal for purposes of ruling on the *Daubert* Motions, especially in light of Defendants' limited redactions. Accordingly, the Motions to Seal [**Docs. 166, 173, and 180**] are **GRANTED**. The Clerk is **DIRECTED** to seal [Docs. 167, 168, 174, 181]. With respect to [Doc. 181], portions of Peterson's deposition, Defendants state that they do not oppose releasing the portions of Peterson's deposition that Plaintiff cited to in his brief, *see* [Doc. 179 at 6-7]. Defendants did not include these redactions in their Response, and therefore, they **SHALL** file the said portions of Peterson's deposition cited in Plaintiff's response in the public record.

As a final matter, the Court notes that in Defendants' response they claim that Plaintiff violated the Protective Order in this case. The parties contacted the Court regarding this dispute pursuant to section 3(j) of the Scheduling Order. Section 3(j), however, pertains to discovery disputes, and the Court does not find that allegations of violating the Protective Order should be considered a discovery dispute that can be appropriately determined on a telephone conference

with the Court. Thus, if the parties have not resolved this issue, the Court grants them leave to file any appropriate motions that they deem are necessary.

## V. CONCLUSION

Accordingly, for the reasons explained below, the Court finds as follows:

(1) Plaintiff's Motion to Exclude Proffered Expert Testimony of Mary Anne Osborn and Terry L. Clayton [**Doc. 140**] is **GRANTED IN PART**;

(2) Defendants' Motion to Exclude Expert Testimony of Mr. Jackson [**Doc. 151**] is **DENIED**;

(3) Plaintiff's Motion to Seal Exhibits A-S and B-S to His Response to Defendants' Seventh Motion in Limine [**Doc. 166**] is **GRANTED**;

(4) Plaintiff's Motion to Seal Exhibit A to his Response in Opposition to Doc. 151 [**Doc. 173**] is **GRANTED**; and

(5) Plaintiff's Motion to Seal Exhibit B to his Response in Opposition to Doc. 151 [**Doc. 180**] is **GRANTED**.

**IT IS SO ORDERED.**

ENTER:

_Bruce Guyton_
United States Magistrate Judge