UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

SHAFIQULLAH KOSHANI,              )
                                 )
            Plaintiff,            )
                                 )
v.                               )          No. 3:17-CV-265
                                 )
ERIC WAYNE BARTON,               )
                                 )
            Defendant.           )

## MEMORANDUM OPINION

This matter is before the Court on Defendant's "Renewed Motion for Judgment as a Matter of Law or in the Alternative, For a New Trial or Remittitur" [doc. 265]. Plaintiff has responded [doc. 294], and Defendant has replied [doc. 295]. This matter is now ripe for the Court's review. For the reasons stated below, Defendant's motion will be denied.

## I.    Background

The plaintiff, Shafiqullah Koshani, a citizen and resident of Afghanistan, filed the instant suit against defendants Eric Barton, a citizen of the United States, and Vanquish Worldwide, LLC, alleging that he and Mr. Barton established a joint venture in Afghanistan in 2010. They documented the terms of their joint venture in a Joint Venture Agreement ("JVA") [doc. 41-1], which entitled Plaintiff to receive fifty-one percent of any net profits. Plaintiff asserted that the parties registered the joint venture with the Afghan government and procured a business license from the Afghanistan Investment Support

Agency ("AISA"); named their new business Vanquish Worldwide ("Vanquish Afghanistan"); and pursued a contract with the United States Army, which was soliciting bids for a project known as "National Afghan Trucking," or "NAT," in Afghanistan.

However, Plaintiff alleged that Mr. Barton ultimately submitted a proposal to the United States in response to the NAT solicitation, but he did not submit it in Vanquish Afghanistan's name. Instead, Mr. Barton allegedly submitted the proposal on behalf of a company with a nearly identical name, Vanquish Worldwide, LLC ("Vanquish United States")—a company that he allegedly owned in Tennessee—and tabbed Vanquish Afghanistan as a subcontractor that would render services under the contract. The United States ultimately awarded the NAT contract to Vanquish United States.

Plaintiff alleged that, thereafter, Mr. Barton informed him that he had secured the NAT contract on Vanquish United States' behalf, instead of on Vanquish Afghanistan's behalf, and asked Plaintiff to agree to make Vanquish Afghanistan a subcontractor under the NAT contract. Plaintiff claimed that he refused to do so because he had agreed to be Mr. Barton's partner, not his subcontractor, and he insisted that they proceed with the terms of the JVA. Plaintiff and Mr. Barton then entered into a Profit Sharing Agreement ("PSA"), in which Mr. Barton acknowledged that he had received Plaintiff's help in building Vanquish Afghanistan and creating the proposal that the United States accepted. In the PSA, the parties agreed that Plaintiff would be entitled to half of "Vanquish worldwide's" net profits from the NAT contract, although they also expressed their intention to proceed "as per our agreement."

According to Plaintiff, when the United States began making payments to Vanquish United States under the NAT contract, Mr. Barton initially allocated shares of those payments to him. However, by August 2012, Mr. Barton stopped providing Plaintiff with his share of the profits, and eventually cut Plaintiff out of the business altogether. To recover his share of the NAT profits, Plaintiff filed suit in this Court against Mr. Barton and Vanquish United States, bringing multiple claims, including breach of contract, breach of fiduciary duty, conversion, unjust enrichment, equitable accounting, breach of duty of care, breach of duty of loyalty, breach of duty of trust, usurpation of corporate opportunities, breach of the covenant of good faith and fair dealing, an accounting, and a request for punitive damages.

Defendants responded with several counterclaims. [Doc. 75]. Defendants stated that they submitted a proposal for the NAT contract, which listed Vanquish United States as the prime contractor and Vanquish Afghanistan as the subcontractor, after their initial subcontractor, United Sadat Transportation and Logistics Company ("USC"), partially owned by Plaintiff's brother Farid Koshani, backed out. [*Id*. at 24-25]. After receiving the NAT contract, Vanquish United States allegedly hired Plaintiff's other brother, Jawid Koshani, to serve as Operations Manager under the NAT contract, and Jawid signed a Confidentiality, Non-Disclosure, and Non-Competition Agreement ("NDA") with Vanquish United States. [*Id*. at 25]. Defendants alleged that, after the award of the NAT Contract, Plaintiff refused to allow Vanquish Afghanistan to perform trucking missions, and suggested that Defendants use USC as a subcontractor instead. [*Id*.]. After further discussion, Plaintiff ultimately agreed to use Vanquish Afghanistan for NAT trucking

missions, and signed several agreements on the matter. [*Id*. at 26-27]. However, Defendants state that they later learned that Plaintiff did not truly intend for Vanquish Afghanistan to perform any trucking missions, and every mission was given to USC rather than Vanquish Afghanistan. [*Id*. at 27].

Defendants alleged that at the end of the NAT contract base period, when the United States Army began awarding the first option year, Plaintiff began "making plans to steal the NAT Contract," and recruited his brother Jawid to assist in this scheme. [*Id*.]. Defendants state that Plaintiff created a new Afghan sole proprietorship under a name similar to Vanquish Worldwide that was 100% owned by Plaintiff, registered it with Afghan authorities, and set up a new Afghan bank account for the sole proprietorship. [*Id*. at 28]. Defendants alleged that Plaintiff and Jawid made false statements to the U.S. Government in an effort to convince officials to issue the NAT contract option year to the sole proprietorship rather than Vanquish United States. [*Id*.]. Defendants state that Plaintiff lied to government officials about his entitlement to the NAT contract option year, as well as stating that Mr. Barton had forged signatures on contracts and lied to contracting officials. [*Id*. at 29-30]. Defendants allege that Plaintiff's efforts were successful when the government suspended payments to Vanquish United States under the NAT contract, and also suspended Vanquish United States from receiving any missions under the NAT contract, beginning in October 2012. [*Id*. at 30].

In their counterclaims, Defendants alleged claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of the duty not to misuse partnership assets, tortious interference with the NAT contract, statutory inducement of a breach of the

NAT contract, statutory inducement of a breach of the NDA contract, and conspiracy. [*Id.* at 31-39].

On a motion to dismiss, this Court dismissed a portion of Plaintiff's breach of contract claim, and his claim for an accounting. [Doc. 59 at 5-7, 16-17]. The Court later denied Defendants' motion for summary judgment. [Doc. 113]. The Court then granted summary judgment on Defendants' counterclaims for tortious interference with the NAT contract, statutory inducement of a breach of the NAT contract, and conspiracy, concluding that these claims were barred by the statute of limitations. [Doc. 213]. However, the Court denied summary judgment as to the remaining counterclaims. [*Id.*].

At the final pretrial conference, Plaintiff stated that he intended to limit his evidence before the jury to Count 1 of the Complaint—the breach of contract claim. The matter then proceeded to a 7-day jury trial. At the start of trial, Plaintiff orally moved to amend his complaint to drop Vanquish United States as a defendant, and proceed with Mr. Barton as the only defendant.[1] [Doc. 281 at 9]. The Court granted the motion. [*Id.*]. The Court also dismissed Defendant's Counterclaim 3, which alleged misuse of partnership assets under Afghan law, after Defendant stated that he had no evidence to present as to the applicable Afghan law. [*Id.* at 6-7].

At the close of Plaintiff's evidence, Defendant moved for judgment as a matter of law on Plaintiff's breach of contract claim, pursuant to Federal Rule of Civil Procedure 50.

---

[1] The remainder of this memorandum opinion will use the term "Defendant" to refer to Mr. Barton exclusively.

[Doc. 283 at 172]. The Court denied Defendant's motion for judgment as a matter of law at that time. [*Id*. at 190]. Defendant then proceeded to present his evidence.

At the conclusion of all evidence, both Plaintiff and Defendant moved for judgment as a matter of law, pursuant to Rule 50, on both Plaintiff's claim and Defendant and Vanquish United States' counterclaims. [Doc. 286 at 214-38]. The Court granted Plaintiff's motion for judgment as a matter of law on the remaining counterclaims. [Doc. 243]. As to Defendant's breach of contract claim, the Court concluded, based on Defendant's own testimony, that the claim was barred by the statute of limitations. [*Id*. at 1]. As it did at the summary judgment stage, the Court rejected Defendant's claim that the Tennessee suspension statute applied. [*Id*.]. The Court further concluded that it necessarily must grant judgment in Plaintiff's favor on Defendant's counterclaim alleging breach of the implied covenant of good faith and fair dealing, because such claim is not a stand-alone claim, but is, rather, part of an overall breach of contract claim. [*Id*. at 2]. Finally, the Court granted judgment in Plaintiff's favor on Vanquish United States' counterclaim alleging inducement of a breach of the NDA, finding that Vanquish United States had presented no evidence that Plaintiff knew of the NDA, intended for it to be breached, acted maliciously, or that Vanquish United States suffered damages. [*Id*.].

After dismissing each of the remaining counterclaims, the Court moved on to address Plaintiff's motion for judgment as a matter of law on several of the defenses raised to the remaining breach of contract claim. The Court granted the motion as to the defenses of laches and merger. [*Id*. at 2-3]. Specifically, as to merger, the Court stated that the elements of merger had not been established because the evidence did not support a finding

that the parties intended the PSA and the so-called Partnership Agreement, a third agreement introduced at trial, to merge. [*Id*. at 3]. In the alternative, the Court also stated that the PSA and the Partnership Agreement did not contain materially inconsistent terms, such that they could not stand together as supplemental agreements, and thus, the merger doctrine did not apply. The Court denied Plaintiff's motion as to the defense of first material breach and Defendant's liability on the breach of contract claim. [*Id*.]. The Court also denied Defendant's renewed motion for judgment as a matter of law on the issue of liability, determining instead that Plaintiff's claim was a proper factual dispute for the jury to decide, and there was sufficient evidence to submit the issue to the jury. [*Id*. at 3-4].

The jury ultimately concluded that Plaintiff had proven by a preponderance of the evidence that Defendant breached the PSA by failing to share profits with Plaintiff. [Doc. 247 at 1]. The jury also concluded that Defendant had not shown by a preponderance of the evidence that Plaintiff was the first to materially breach the PSA. [*Id*. at 2]. The jury then found that the amount of compensatory damages that proximately resulted from Defendant's breach of the PSA was $33,428,859.00. [*Id*.]. Accordingly, the Court entered final judgment in Plaintiff's favor, awarding damages in the amount of $33,429,859. [Doc. 256]. Thereafter, Defendant filed the instant renewed motion for judgment as a matter of law, or, in the alternative, new trial or remittitur. [Doc. 265].

## II.    DISCUSSION

### A.  Renewed Motion for Judgment as a Matter of Law

Under Rule 50(b) of the Federal Rules of Civil Procedure,

> If the court does not grant a motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment—if the motion addresses a jury issue not decided by a verdict—no later than 10 days after the jury was discharged. The movant may alternatively request a new trial or join a motion for new trial under Rule 59.

Fed. R. Civ. P. 50(b).  A renewed motion for judgment as a matter of law should be granted if in "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party."  *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004).

"A federal court sitting in a diversity case must apply the directed verdict standard of the state whose substantive law governs the action."  *Cansler v. Grove Mfg. Co.*, 826 F.2d 1507, 1510 (6th Cir. 1987) (quoting *Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 269 (6th Cir. 1985)).  Under Tennessee law, a motion for judgment notwithstanding the verdict is the state-law equivalent to a federal motion for judgment as a matter of law.  *Tipton v. Union Tank Car Co.*, No. 3:15-cv-311, 2018 WL 6729641, at *2 (E.D. Tenn. Dec. 21, 2018).  Both motions are thus evaluated under the same standard.  *Id.*

It is well-established "that a post-trial motion for judgment as a matter of law 'is not available at anyone's request on an issue not brought before the court prior to the

submission of the case to the jury.'" *Ford v. County of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)). Thus, "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Id.* (quoting Fed. R. Civ. P. 50, 2006 Amendment, advisory committee's note). Here, the only issues raised both in Defendant's pre-verdict motion for judgment as a matter of law and the instant motion are Defendant's arguments regarding Mr. Barton's personal obligation under the PSA and the application of the merger doctrine. Accordingly, to the extent that Defendant seeks judgment as a matter of law on any other issues raised in his motion, the Court will **DENY** the motion as procedurally improper. The Court will, however, address those issues in the context of Defendant's alternative requests for a new trial or remittitur.

### 1. Mr. Barton's Personal Obligation

Defendant first asserts that the PSA did not personally obligate him to pay anything to Plaintiff. [Doc. 266 at 12]. Defendant contends that the only way he could have personally breached the terms of the PSA is if he received more than 50% of the NAT profits, but Plaintiff did not even attempt to establish this fact. [*Id.*] Defendant asserts that, at most, he received $30.8 million from Vanquish United States, but Plaintiff did not show which distributions related to NAT profits. [*Id.* at 13]. Because Plaintiff did not show that he received more than 50% of the NAT profits, to hold him personally accountable, Plaintiff was required to pierce the corporate veil, but Plaintiff did not even argue for veil piercing. [*Id.* at 13-14]. In the alternative, Defendant requests remittitur because Tennessee law does not allow Vanquish United States to be held liable for claims raised

only against Mr. Barton, and therefore, the verdict should be reduced to 50% of some portion of the $30.8 million.  [*Id*. at 15].

Plaintiff responds that it is clear that the PSA obligated Mr. Barton to share profits. [Doc. 294 at 4].  Plaintiff first contends that this is not a proper subject for a renewed motion for judgment as a matter of law, because Defendant did not raise it in his original Rule 50 motion.  [*Id*.].  Nevertheless, Plaintiff argues that Defendant's attempt to read the PSA as only obligating him not to receive more than 50% of the profits is absurd, and would render the agreement illusory, defy common sense, and produce a result contrary to the plain language of the agreement.  [*Id*. at 5-6].  Moreover, Plaintiff contends that he is not attempting to pierce the corporate veil.  [*Id*. at 6].  Rather, in the PSA, Mr. Barton was the one who agreed to share profits with Plaintiff, and, as the sole member, 100% owner, President, and CEO of Vanquish United States, there was no reason Mr. Barton could not promise to share Vanquish United States' profits.  [*Id*. at 6-7].

Defendant replies that he did raise this issue in his original Rule 50 motion.  [Doc. 295 at 14].  Defendant contends that there is no express language in the PSA that states that he is required to pay Plaintiff, and absent such, Plaintiff would need to pierce the corporate veil to collect from him.  [*Id*. at 15].  Moreover, Defendant contends that, even if the PSA is construed to state that he is obligated to make payments to Plaintiff, there is no evidence in the record that Plaintiff ever "earned" his share of the profits.  [*Id*. at 16].  Thus, there was insufficient evidence for the jury to conclude that Defendant received any amounts from Vanquish United States based solely on the NAT contract.  [*Id*. at 17].

As an initial matter, the Court notes that Defendant is correct regarding the initial Rule 50 motion. Defendant raised this issue in his oral Rule 50 motion, made at the conclusion of all of the evidence at trial. The Court denied Defendant's Rule 50 motion on this ground, finding that this was a proper factual dispute for the jury, and there was sufficient evidence to submit the matter to the jury. [Doc. 243 at 4]. Accordingly, the Court will review this matter under the standard for a renewed motion for judgment as a matter of law.

The Court concludes that the terms of the PSA are ambiguous as to exactly how the profits were to be split by the parties. Notably, the PSA states that the net profit "shall be divided among the parties as follows: Eric Barton shall receive 50% Percent and Shafiqullah Koshani shall receive 50% percent of profit after expenses." [PX1]. Additionally, Mr. Barton arguably appears to have signed the PSA in his personal capacity, as the signature line merely states "Eric Barton," and includes Mr. Barton's signature. The signature line contains no indication that Mr. Barton was signing in his capacity as an officer of Vanquish United States. The PSA further states that, in light of past assistance from Plaintiff, "*I* acknowledge that the profit that will be earned in NAT Shafiqullah Koshani shall earn 50% of the whole profit after expenses and Eric Barton shall receive 50% of the whole contract after expenses[.]" [*Id.* (emphasis added)]. The "I" in this sentence appears to reference Mr. Barton, in his personal capacity. In light of this ambiguity as to the party responsible for sharing the Vanquish United States profits, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a genuine issue of material fact existed for the jury, and reasonable minds could come to

differing conclusions.  Accordingly, the Court will not disturb the jury's ultimate conclusion that Defendant was liable under the PSA, and the Court will **DENY** Defendant's renewed motion for judgment as a matter of law on this ground.

### 2. Merger Doctrine

Defendant notes that the Court has already ruled that there was a genuine issue of material fact as to whether the Partnership Agreement was a new agreement or a collection of prior agreements [Doc. 266 at 16].  Defendant asserts that, on its face, it is clear that the Partnership Agreement cannot be a collection of prior agreements because some of the language from the JVA and the PSA was altered in the Partnership Agreement.  [*Id*.].  Thus, Defendant contends, the merger doctrine applies.  [*Id*. at 17].

Plaintiff responds that there is insufficient evidence that the parties intended to create a new agreement and discard the prior agreement.  [Doc. 294 at 9].  Plaintiff notes that the Partnership Agreement does not contain a merger clause or any language purporting to supersede any other agreement.  [*Id*.].  Finally, Plaintiff argues that Defendant points to no evidence that there is anything materially different in terms of the PSA and the PSA language reproduced in the Partnership Agreement.  [*Id*. at 10].

Defendant replies that a merger clause is not necessary for application of the merger doctrine.  [Doc. 295 at 9].  Defendant contends that, although extraneous evidence is permissible if the Partnership Agreement is ambiguous, it does not permit the parties' testimony to be considered, so the Court should disregard Plaintiff's testimony.  [*Id*. at 10].  Defendant states that the evidence is clear from the parties' course of conduct that the Partnership Agreement was the parties' final agreement.  [*Id*. at 11].  Finally, Defendant

contends that the merger doctrine does not require inconsistencies, and nonetheless, there were numerous inconsistencies, including the Partnership Agreement containing a duration clause. [*Id*. at 11-12].

Under the merger doctrine, when parties to a contract enter into a subsequent agreement concerning the same subject matter as the first contract, the earlier contract merges into the latter contract, and is rescinded and extinguished. *Shree Krishna, LLC v. Broadmoor Inv. Corp.*, No. W2011-00514-COA-R3-CV, 2012 WL 312254, at *14 (Tenn. Ct. App. Feb. 1, 2012). For the merger doctrine to apply, the successive contracts must have the same parties and generally must contain inconsistent terms, such that they cannot be considered supplemental agreements. *Id*. Inconsistency of terms is the crux of the merger doctrine inquiry. *Great American Ins. Co. v. Nelson, Inc.*, 276 F. Supp. 3d 762, 768 (W.D. Tenn. 2017). Moreover, "[a]dditional terms are not necessarily inconsistent terms." *Id*. at 769.

Defendant contends that "inconsistent terms are not a prerequisite to the application of the merger doctrine," citing *Robert J. Young Co. v. Nashville Hockey Club, Ltd., Partnership*, No. M2006-2511-COA-R3-CV, 2008 WL 820488 (Tenn. Ct. App. Mar. 26, 2018), for this proposition. Indeed, in his citation to *Robert J. Young*, Defendant includes a parenthetical containing the following purported quote from the case:

> Inconsistent terms may enable a Court to easily infer merger without having to closely scrutinize the intent of the parties. Where terms are consistent, the Court cannot automatically infer merger, but the merger doctrine may still apply if it is clear that the parties intended for the last agreement to be a complete and final expression of their relationship.

13

[Doc. 266 at 5]. The Court has fully reviewed the *Robert J. Young* case, and no such quotation exists. To the contrary, the case, like the cases cited previously by the Court, states that "[i]f the parties to a prior agreement enter into a subsequent contract that completely covers the same subject, but the second agreement contains terms that are inconsistent with those of the prior agreement, and the two documents cannot stand together, the later document supersedes and rescinds the earlier agreement." *Robert J. Young*, 2008 WL 820488, at *6 (quoting 17B C.J.S. *Contracts* §§ 434 and 435 (1999)). Not only does this case not contain the purported quotation presented by Defendant, but, despite varied attempts to locate a case, or any source at all, containing this quote, the Court has been unable to locate the source of the purported quote. Because Defendant has cited no other valid citations in support of his contention that inconsistent terms are not a prerequisite to the application of the merger doctrine, and the Court's review of Tennessee case law on the matter indicates that the opposite is true, the Court will not entertain this argument. The Court cautions defense counsel that, in any future filings, he should diligently review the citations presented to the Court to ensure that the information presented is accurate.

Nonetheless, since Defendant has brought the *Robert J. Young* case to the Court's attention, the Court notes that the case states as follows:

> [D]eviations or changes in a contract do not necessarily abrogate it or imply its abandonment, and where it is claimed that by reason of inconsistency between the terms of a new agreement and those of the old the old one is discharged, ***the fact that such was the intention of the parties must clearly appear***.

*Id.* (quoting 17B C.J.S. *Contracts* §§ 434 and 435 (1999)) (emphasis in original). Accordingly, the Court concluded that "it is the intent of the parties that controls the question of abrogation by subsequent agreement." *Id.* In granting Plaintiff's Rule 50 motion on the merger doctrine, the Court concluded that "the evidence does not support a finding that the parties intended the [PSA] and the so-called Partnership Agreement to merge." [Doc. 243 at 3]. Defendant now contends that there was direct testimony, namely, Defendant's own testimony, that the parties intended the Partnership Agreement to replace the PSA. [Doc. 266 at 4]. The Court heard the evidence presented at trial, and has reviewed that evidence again, and concludes that there was insufficient evidence to support a finding that *both* parties intended the Partnership Agreement and the PSA to merge.

In the alternative, the Court stated that the PSA and the Partnership Agreement "did not contain ***materially*** inconsistent terms, such that they cannot stand together as supplemental agreements[.]" [Doc. 243 at 3 (emphasis added)]. Defendant appears to misconstrue the Court's ruling, stating that the Court "ruled that there were ***no*** inconsistent terms between the PSA and PA." [Doc. 266 at 4, n. 6 (emphasis added)]. The law on the doctrine of merger, in the State of Tennessee, does not require a finding that there were ***no*** inconsistencies between the PSA and the Partnership Agreement. Rather, the doctrine of merger applies if there are inconsistencies between the documents *such that they cannot stand together as supplemental documents. Shree Krishna,* No. W2011-00514-COA-R3-CV, 2012 WL 312254, at *14 (emphasis added). While Defendant points to various inconsistencies in the two documents at issue here, Defendant points to no ***material*** inconsistencies, that would prevent the documents from standing together as supplemental

agreements, even assuming that the Partnership Agreement is a separate contract. Moreover, Defendant primarily points to additions to the PSA's language that are included in the full Partnership Agreement as the "inconsistent terms" on which he relies. However, as Defendant's own case law points out, "deviations or changes" are not alone sufficient to merit application of the merger doctrine. *Robert J. Young*, 2008 WL 820488, at *6 (quoting 17B C.J.S. *Contracts* §§ 434 and 435 (1999)). Accordingly, Defendant has not met his burden of proving that, viewing the evidence in the light most favorable to Plaintiff, the Court clearly erred in granting Plaintiff's motion for judgment as a matter of law.

## B.  Motion for a New Trial or Remittitur

Under Rule 59, the Court "may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In this circuit, courts interpret this language to mean that a new trial is improper unless a jury reached a result that is "seriously erroneous," "as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some way, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citations omitted). A decision to grant or deny a motion for a new trial "is discretionary with the district court." *Davis by Davis v. Jellico Cmty. Hosp. Inc.*, 912 F.2d 129, 132–33 (6th Cir. 1990) (citations omitted); *see L-S Indus. v. Matlack*, No. 3:07-CV-273, 2010 WL 2696202, at *1 (E.D. Tenn. July 6, 2010) (noting that a district court has "broad discretion" when deciding the propriety of a new trial under Rule 59 (citations omitted)). However, this Court "[is] not free to reweigh

the evidence or set aside the jury verdict merely because the jury could have drawn different inferences or conclusions." *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir.2000) (citing *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.1967)).

As an initial matter, as to Defendant's arguments regarding his personal liability under the PSA and the doctrine of merger, to the extent that Defendant seeks a new trial on these grounds, the Court will deny the motion for the reasons stated above. The Court will now address whether Defendant has established grounds for a new trial based on any other argument raised in his motion.

### 1. Investment Repayment

Next, Defendant contends that the verdict included more than $200,000 for investment repayment, but there was no term in the parties' contract for repayment of investment. [Doc. 266 at 18]. Defendant states that, even if there was a term in the contract, Plaintiff did not raise the investment repayment as a claim in this matter. Thus, Defendant contends that the Court should grant a new trial or remittitur to remove $214,800 from the verdict. [*Id.*].

Plaintiff responds that a remittitur of $214,800 is not warranted. [Doc. 294 at 10]. Plaintiff explains that Vanquish United States' records showed an entry of $158,711.10 in August of 2012 to "write down Koshani loan," but this amount was never actually paid to Plaintiff. Thus, by recording a write-down, but not paying the amount to Plaintiff, the figure was recorded as income to Vanquish United States, meaning that reversing the entry would decrease the total amount of Vanquish United States' profits. Plaintiff explains that, to account for this, the expert witness included a separate item reflecting the amount that

Vanquish United States' books showed that Plaintiff was owed, so that the profit calculation was not artificially inflated. [*Id*.].

Defendant replies that there is no support in the record for Plaintiff's argument and it is not a rational interpretation of the facts. [Doc. 295 at 13]. Defendant states that the expert witness did not testify that he made this adjustment so that profit was not artificially inflated. Moreover, Defendant states that, if profits would be decreased by removing the $158,711.10 figure, Plaintiff's damages should be half of that amount, or $79,355.55. [*Id*.]. Defendant contends that the expert witness testified that this amount was to return the full amount of Plaintiff's investment, and amounts for investment repayment are not profits and have no place in the verdict, therefore, the verdict is overstated by $214,800. [*Id*. at 13-14].

At trial, Jimmy Jackson, a business consultant hired by Plaintiff, testified that, based on Vanquish United States' books, it appeared that in the summer of 2012, Vanquish United States made the decision not to repay Plaintiff the full amount of his investment or loan. [Doc. 282 at 216-17; Doc. 283 at 36]. Jackson noted an entry on the books that stated "to write down Koshani loan." [Doc. 283 at 38]. Jackson explained that, essentially, Vanquish United States wrote off the liability to Plaintiff for approximately $158,000, and then recorded it as income. [*Id*.]. Jackson testified that this allege loan write-down was recorded as income in 2012, so, in calculating damages, he reversed the income, thereby reducing Vanquish United States' income for 2012, but included the amount as a separate amount due to Plaintiff, in order to return the full amount of his investment. [*Id*. at 40-41]. Jackson concluded that the total for Plaintiff's percent of profits, including interest, on the

NAT contract was $33.2 million, on the NAT 1.5 contract was $890,000, and on the NAT 2 contract was negative $39,000. [*Id*. at 43-44]. Regarding the repayment of investment amount, Jackson stated that Plaintiff was owed the $158,000 that he should have received in the summer of 2012, and also prejudgment interest of $56,000, for a total of $215,000 to restore him to the position that he would have been in, but for the failure to make the investment repayment to him. [*Id*. at 44-45].

Jackson stated that the total amount due to Plaintiff for both the NAT contracts and the investment repayment plus interest was $33,824,003. [*Id*. at 45]. Jackson broke this down as follows: (1) NAT 1.0 contract, including prejudgment interest: $33,214,059; (2) NAT 1.5 contract, including prejudgment interest: $890,488; (3) NAT 2.0 contract, including prejudgment interest: negative $495,344; and (4) investment repayment with prejudgment interest: $214,800. [*Id*. at 45-46]. On cross-examination, Jackson testified that the approximately $800,000 that Vanquish United States did repay to Plaintiff was not an expense or revenue, so he did not include it in his calculations. [*Id*. at 115-16].

Defendant appears to somewhat misinterpret Jackson's testimony regarding the $214,800. The Court understands Jackson's testimony to say that, in calculating damages, he: (a) removed the $158,711 from Vanquish United State's profits, because inclusion of the Koshani loan "write off" artificially inflated profits by this amount; and (b) calculated a separate category of damages for the repayment of investment, which, with the inclusion of prejudgment interest, equaled $214,800. Ultimately, the jury returned a verdict in favor of Plaintiff, awarding him $33,428,859 in damages. This figure was clearly the addition of Jackson's calculated damages on the NAT 1 contract and for repayment of investment.

However, the jury declined to include the amounts Jackson calculated relative to the NAT 1.5 and NAT 2 contracts. Thus, it is obvious that the jury considered thoroughly what amounts presented Defendant was obligated to pay to Plaintiff under the terms of the PSA.

Moreover, the Court concludes that a jury could reasonably find that Defendant was obligated to repay Plaintiff's investment, in addition to profits, under the terms of the PSA. Contrary to Defendant's assertion, Plaintiff did request compensatory damages equal to his capital investments in his amended complaint. [Doc. 41 at 25]. By its terms, the PSA consistently refers to the parties' share of profits "after expenses." A reasonable jury could conclude, in light of the evidence presented, that the investment repayment was an expected expense, which the parties intended to be repaid before profits were distributed under the terms of the PSA, and therefore, that Defendant was obligated to repay this amount to Plaintiff. Accordingly, the Court will not disturb the jury's determination, and will **DENY** Defendant's request for a new trial, or remittitur, on this ground.

### 2. PSA terminated December 2013

Reiterating their prior argument, Defendant contends that the JVA contained a 3-year term, and thus, terminated on December 17, 2013. [Doc. 266 at 18]. Thus, Defendant contends that, even if he performed the contract as the jury interpreted it, the maximum amount owed to Plaintiff by December 2013 was $808,905. [*Id*. at 19-20].

Plaintiff responds that this argument does not rely on the terms of the PSA, but rather, the terms of the JVA. [Doc. 294 at 11]. Plaintiff states that, at trial, Defendant testified that the JVA was supplanted by the AISA application, which did not contain a duration clause, so this argument is contrary to Defendant's own evidence. [*Id*.]. Finally,

Plaintiff states that Defendant was able to argue this theory to the jury, but the jury plainly rejected it. [*Id*. at 12].

Defendant replies that PSA incorporates the JVA, because, on its face, it makes reference to the JVA on two occasions. [Doc. 295 at 4]. Further, Defendant contends that Plaintiff has expressly acknowledged through this litigation that the PSA incorporated the JVA, and should be judicially estopped from denying such now. [*Id*.]. Defendant thus contends that the entirety of the JVA was incorporated into the PSA, including the duration clause. [*Id*. at 5].

Defendant raised this argument, and the Court rejected it, at the summary judgment stage. [Doc. 112 at 11]. Specifically, this Court concluded that the language of the PSA was ambiguous as to whether the partnership automatically terminated after three years when a later agreement (the PSA), which did not contain a duration clause, was signed by the parties, and the partnership was never wound up and dissolved as required by the JVA. The Court concluded that, because the contract language was ambiguous, it needed to determine the parties' intent to conclude that the PSA automatically terminated after three years, but found that there was insufficient evidence as to the parties' intent at the summary judgment stage. [*Id*.].

At trial, Defendant raised this argument, that the PSA terminated in December 2013, to the jury. [Doc. 289 at 36-38]. However, the jury necessarily rejected this argument in finding in Plaintiff's favor, and awarding damages of $33,428,859. There was ample evidence presented at trial to allow a reasonable jury to conclude that the parties did not intend the PSA to terminate in December 2013. For example, neither the finalized PSA,

nor the draft PSA created by Defendant, contained any reference to the duration clause contained in the JVA, or any other duration limitation. [PX1; PX30]. Moreover, Defendant testified at trial that the JVA "was not intended to start – to start the business. It was intended to start a relationship. The application for the AISA license is what actually started a business entity[.]" [Doc. 284 at 152]. Nothing in the AISA license obtained by the parties contained any duration clause or limitation. [PX5]. Based on this evidence, a reasonable jury could conclude that the parties did not intend for the JVA's duration clause to apply to the PSA.

Ultimately, the jury was presented with Defendant's theory, and rejected the contention that the PSA automatically terminated in December 2013. Because a reasonable jury could have rejected Defendant's theory, based on the evidence presented at trial, the Court finds that there are no grounds for a new trial. The Court need not reach Defendant's argument regarding judicial estoppel. Accordingly, the Court will **DENY** Defendant's request for a new trial, or remittitur, on this ground.

### 3. PSA related to Vanquish Afghanistan, not Vanquish United States

Next, Defendant contends that the language of the PSA refers to the profits of the Afghan partnership, not Vanquish United States. [Doc. 266 at 20]. Defendant notes that the Court has already determined that the term "Vanquish Worldwide" in the PSA is ambiguous. Defendant then points to Section 5 of the JVA, which contains the "no other remuneration" provision. Defendant contends that, if the PSA is interpreted to apply to the profits of Vanquish United States, the remuneration clause would be meaningless, since the PSA would allow other remuneration from the joint venture in the form of shared

profits. [*Id.*]. Defendant notes that ambiguity should be construed against the drafter, which in this case, is Plaintiff. [*Id.* at 21].

Plaintiff responds that the PSA does not apply only to profit of Vanquish Afghanistan. [Doc. 294 at 12]. Plaintiff notes that this Court rejected this argument at both the motion to dismiss and summary judgment stages, and the jury rejected it at trial. [*Id.* at 13]. Nonetheless, Plaintiff argues that the terms of the PSA plainly refer to profits on the NAT contract, not a subcontract, and the surrounding circumstances make clear that the parties agreed to share the profits of the prime NAT contract. [*Id.* at 13-14]. Specifically, Plaintiff points to the facts that: (1) Defendant's draft of the PSA expressly provided that Vanquish would pay Plaintiff a fee equal to 50% of the profit of the company from NAT; (2) Defendant gave Plaintiff access to Vanquish United States' First Tennessee bank account; and (3) the parties repeatedly asked the government to change the account into which it made payments for the NAT contract to a joint account in Afghanistan. [*Id.* at 14-15]. Plaintiff contends that Defendant's attempted reliance on Section V of the JVA fails because it rests upon an argued interpretation of a provision in a different contract than the one on which the claims at trial were based, and the JVA was supplanted according to Defendant's own testimony. [*Id.* at 15-16].

The Court previously addressed this argument at the summary judgment stage. [Doc. 112 at 18]. Specifically, the Court concluded that, because the PSA used the term "Vanquish worldwide" to refer to both Vanquish United States and Vanquish Afghanistan, the PSA was ambiguous as to which company's profits were to be shared. The Court thus found that there was a genuine issue of material fact as to the parties' intent regarding

which Vanquish would split profits under the PSA. Thereafter, the parties raised this issue before the jury. Specifically, both of the parties argued extensively during closing argument for their respective interpretations of the term "Vanquish worldwide" in the PSA. [Doc. 289]. Ultimately, the jury agreed with Plaintiff's theory.

The Court finds that there was ample evidence for the jury to conclude that the "Vanquish worldwide," referenced in the PSA, referred to Vanquish United States. Notably, e-mails introduced at trial indicated that Defendant continued to assure the Koshanis that they would be receiving their share of profits under the PSA, long after Defendant knew that Vanquish Afghanistan was not performing any missions as a subcontractor. If the parties intended the PSA to refer to the profits of Vanquish Afghanistan, rather than Vanquish United States, Defendant's assurances that the Koshanis would receive their share of profits, while knowing that that no profits existed, would be entirely illogical. Accordingly, because there was sufficient evidence to support the jury's conclusion that the PSA referred to the profits of Vanquish United States, rather than Vanquish Afghanistan, the Court will **DENY** the motion for a new trial on this ground.

### 4. Evidentiary Matters

Defendant further argues that the Court erred in admitting Plaintiff's Exhibit 152, testimony regarding settlement negotiations, and excluding certain testimony. [Doc. 266 at 21]. Defendant contends that PX152 contained inadmissible hearsay and Rule 408 settlement communications. [*Id.*]. Defendant states that he was also prejudiced by Jawid Koshani's testimony about statements purportedly made during settlement negotiations. [*Id.* at 21-22]. Finally, Defendant contends that the Court excluded admissible testimony

from Mathew Naugher that he was held hostage by the Koshanis and that Jawid threatened to shoot Defendant. [*Id*. at 22]. Defendant contends that these errors made it appear that he agreed that Plaintiff was entitled to 50% profits, and interfered with the jury's credibility determination regarding Jawid's testimony. [*Id*.].

Plaintiff responds that evidentiary rulings, even if erroneous, are generally insufficient to merit a new trial, unless a different outcome would have resulted, absent the error. [Doc. 294 at 16]. Plaintiff contends that Defendant does not explain what statements in PX152 are inadmissible hearsay, why they are hearsay, or what statements relate to a settlement communication. [*Id*.]. Plaintiff contends that ordinary business communications are not settlement negotiations under Rule 408. [*Id*. at 17]. As to the alleged hearsay, Plaintiff contends that Jawid testified at trial, and Defendant's statements and silence are therefore admissions under Rule 801(d)(2). [*Id*.]. Moreover, Plaintiff contends that, even if PX152 was inadmissible, Defendant cannot demonstrate that its exclusion would have produced a different outcome in light of the other evidence showing that Defendant repeatedly assured Plaintiff that he would share the NAT profits with him. [*Id*. at 17-18]. As to Jawid's testimony, Plaintiff states that Defendant did not identify what portion of the testimony was objectionable and never objected to this testimony at trial. [*Id*. at 18]. As to Naugher's testimony, Plaintiff argues that Defendant's exaggerated description of this testimony confirms that the objective was to inflame the passions of the jury and smear Plaintiff and his brother. [*Id*. at 19]. Moreover, Plaintiff states that Defendant has made no attempt to establish that admission of this testimony would have resulted in a different outcome. [*Id*.].

Defendant replies that evidentiary rulings were prejudicial to him. [Doc. 295 at 17]. As to Jawid's testimony, Defendant contends that there is no requirement in the applicable law that Defendant object at trial. Rather, the focus is on whether the testimony is prejudicial, and here the prejudice was "extreme." [*Id.*]. Defendant states that this testimony unfairly portrayed him as a schemer who set out to cheat Plaintiff. [*Id.* at 18]. As to the evidence of settlement negotiations, Defendant states that Jawid's testimony established that a meeting in Dubai was part of a settlement negotiation between the parties, and the statements in PX152 were allegedly made by Defendant in the context of this meeting in Dubai, after Plaintiff had already hired counsel. Defendant further contends that PX152 constitutes inadmissible hearsay. [*Id.*]. As to the Naugher testimony, Defendant contends that the Court overlooked Jawid's testimony on direct examination that he had been falsely accused of making threats against another American, which should have opened the door to Naugher's testimony regarding Jawid's threat. [*Id.* at 19]. Defendant contends that exclusion of this testimony provided the jury with a one-sided version of the facts. [*Id.*].

To secure a new trial, "it is not sufficient for the moving party to show that the district court made a mistake in admitting certain testimony[.]" *Kendel v. Local 17-A United Food and Commercial Workers*, 512 F. App'x 472, 479 (6th Cir. 2013). A jury's verdict should only be overturned based on "evidentiary errors . . . if they were not harmless." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006). "The harmless-error standard provides that if 'one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that

substantial rights were not affected." *Id.* at 409-10 (quoting *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2002)). In applying the fair assurance test, the Court must first ask whether an evidentiary error occurred, and then examine the proceedings in their entirety. *Kendel*, 512 F. App'x at 480. "Application of the test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision." *Id.* (quoting *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004)) (internal quotation marks omitted).

### a. Plaintiff's Exhibit 152 and Jawid Koshani Testimony

Defendant objected to the introduction of Plaintiff's Exhibit 152 ("PX152") at trial, arguing both that the exhibit was hearsay and contained settlement negotiations. [Doc. 283 at 156]. As to the settlement negotiation, Defendant argued that the parties met in Dubai to "try to work through some problems" between Vanquish United States and USC, and Farid Koshani was "try[ing] to bridge the gap in the relationship between Eric Barton and Shafiq Koshani." [*Id.*]. Accordingly, Defendant contended that any statements made in Dubai were part of settlement negotiations. [*Id.* at 157]. Plaintiff argued that the statements in Dubai were not settlement negotiations under Rule 408, but were instead, part of the same discussions that had been ongoing between business partners. Plaintiff stated that there was no threatened litigation at this point and there were no lawyers involved. The Court agreed that Rule 408 did not apply, and overruled the objection. [*Id.*].

PX152 is an e-mail from Jawid Koshani to Eric Barton, dated November 2, 2012. The email states, in relevant part:

As we per our discussion yesterday dated 01-11-2012 in Grant Hayat hotel in Dubai you confirmed that Shafiq Koshani owned 50% of the NAT contract and you also confirmed that Shafiq will be receiving 50% profit and you will be receiving 50% from this contract as well.

[PX152]. After the exhibit was admitted, Jawid testified that the e-mail was referencing a discussion at the Grant Hyatt Hotel in Dubai that occurred on November 1, 2012. [Doc. 283 at 158]. Jawid stated that, after the issue of nonpayment by Defendant arose, there were several discussions with Defendant, who asked if the Koshanis could meet in Dubai to discuss a solution. [*Id.*]. Jawid stated that, at the meeting, Defendant confirmed that Plaintiff owned 50 percent of the NAT contract and would receive 50 percent of the profits. [*Id.* at 158-59].

As an initial matter, the Court notes that Defendant's entire argument on both the hearsay and settlement negotiation matters was limited to approximately one page in his memorandum in support of his motion, which cited no law in support of his arguments. [Doc. 266 at 21-22]. On this ground alone, the Court could conclude that Defendant's arguments are so cursory that he has not met his burden of establishing entitlement to a new trial on this ground. Nevertheless, the Court will address the merits of these arguments, to the extent possible.

### i. Hearsay

Hearsay is generally inadmissible in federal court, unless a relevant exception applies. Fed. R. Evid. 802. Hearsay is defined as a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c).

Notably, the Court did not explicitly address the hearsay objection as to this exhibit and testimony at trial, but rather, like the parties, concentrated on the Rule 408 objection, discussed further below. However, in overruling the objection, the Court implicitly overruled the hearsay portion of the objection.

Although, as noted above, Defendant provides almost no explanation for how PX152 contains hearsay, it appears to the Court that there are two levels of potential hearsay at issue. First, the e-mail itself is an out-of-court statement of Jawid Koshani. Second, the e-mail contains a statement purportedly made by Defendant during a meeting in Dubai. However, the purported statement of Defendant does not qualify as hearsay, because it is a statement being offered against an opposing party, and was made by the party. Fed. R. Evid. 801(2)(A). Moreover, Jawid's e-mail is not hearsay, because it is the prior statement of a witness, which is consistent with the witness's testimony and was offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying[.]" Fed. R. Evid. 801(d)(1)(B)(i). The e-mail was consistent with Jawid's testimony that Defendant had promised to split the profits of the NAT contract with Plaintiff, and was offered, in part, to rebut Defendant's implication throughout the trial that Jawid's testimony was incredible, based on his familial relationship to Plaintiff, and the cultural significance of such relationship in Afghanistan. Thus, the Court concludes that PX152 did not contain hearsay. Furthermore, even if PX152 contained inadmissible hearsay, the admission of this exhibit was harmless error, given the other evidence introduced at trial, Accordingly, the Court will **DENY** Defendant's request for a new trial on this ground.

### ii. Settlement Negotiations

Under Rule 408 of the Federal Rules of Evidence, the following evidence is not admissible either to prove or disprove the validity or amount of a disputed claim or to impeach by prior inconsistent statement or a contradiction:

> (1) furnishing, promising or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

Fed. R. Evid. 408(a). The rule "excludes only evidence of conduct and statements made solely as part of the settlement negotiations, and not statements and conduct made at [a] meeting which are unrelated to such compromise negotiations." *Trans Union Credit Information Co. v. Associated Credit Services, Inc.*, 805 F.2d 188, 192 (6th Cir. 1986). In *Trans Union*, the Sixth Circuit noted that a conversation regarding the "interpretation of [a] contract [and] how the [parties] would proceed[,]" was a settlement negotiation under Rule 408. *Id.* However, at the time of such conversation, the plaintiff had already filed the instant action and the parties' counsel had agreed that the discussions would not be later used for any purpose. *Id.* The Court concluded that, within this context, the meeting appeared to be a settlement negotiation.

However, here, at the time of the parties' meeting in Dubai, which was apparently intended, in part, to "try to bridge the gap in the relationship between Eric Barton and Shafiq Koshani," it appears that there was no threatened legal action, nor had the parties

retained counsel to represent them with regard to such matter. Certainly, at the point of this meeting, Plaintiff had not filed the instant action. The Court notes that the Tenth Circuit has held that parties' communications are not settlement negotiations under Rule 408 when "[t]he discussions had not crystallized to the point of threatened litigation, a clear cut-off point[.]" *Big O Tire Dealers Inc., v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977). The Court agrees with this interpretation of the meaning of "settlement negotiations" within the context of Rule 408. Here, because there was no litigation regarding the instant claim at the time of the meeting in Dubai, the conversation was not a settlement discussion within the meaning of Rule 408. Furthermore, as noted above, even if the admission of PZ152 and Jawid's related testimony violated Rule 408, such error was harmless in light of the other evidence produced at trial. Accordingly, the Court will **DENY** Defendant's request for a new trial on this ground.

### b. Naugher's Testimony

In his omnibus motion in limine, Plaintiff moved to exclude "irrelevant and prejudicial accusations of misconduct and other acts." [Doc. 143 at 6]. Plaintiff requested that the Court exclude "inflammatory accusations about Mr. Koshani and his family" including allegations "that Mr. Koshani or his family engaged in hostage-taking [or] threatened Defendants[.]" [*Id.*]. In response, Defendant stated that he agreed that assertions, including that Plaintiff kidnapped or threatened Vanquish United States employees "do not have substantial relevance to this case" and thus, Defendant did "not intend to introduce evidence regarding those issues as part of this case." [Doc. 177 at 5].

Based on Defendant's concession, the Court granted Plaintiff's omnibus motion in limine on this ground. [Doc. 235 at 17].

At trial, Defendant called Mathew Naugher, who had been employed as Vanquish United States' regional manager for the NAT contract. [Doc. 284 at 78]. Naugher stated that Vanquish United States had an office in Kabul at a villa in Qala-e-Fatullah. [*Id*. at 80]. Both Jawid and Shafiqullah Koshani had offices in the villa. [*Id*.]. While in Afghanistan, Naugher lived in the villa. [*Id*. at 89]. In December 2012, Vanquish United States moved its operations to another villa. [*Id*. at 98]. Naugher testified that, when he left the villa, he was not allowed to bring all of the items that Vanquish United States had at the original villa, he was only allowed to take a backpack. Naugher stated that Plaintiff told him that he could not take other items. [*Id*.]. On cross-examination, Naugher testified that he moved out of the villa because there had been a rift between Plaintiff and Defendant. [*Id*. at 108]. Plaintiff's counsel asked if that rift was because Defendant had stopped paying Plaintiff, and Naugher responded that, as far as he was aware, the Koshanis had been paid back. [*Id*.]. Naugher testified that he knew Defendant and Plaintiff were disputing, but did not know what it was about. [*Id*. at 109].

Thereafter, at a bench conference, defense counsel asserted that, by asking why Naugher left the villa, Plaintiff's counsel had opened the door to Naugher's testimony that the reason he left the villa was because he was being held against his will. [*Id*. at 112]. Plaintiff's counsel responded that the door was not opened to such testimony, and defense counsel was merely looking for reasons to admit this evidence. [*Id*. at 112-13]. The Court excused the jury, and defense counsel proffered Naugher's testimony. [*Id*. at 113-14].

Naugher testified that he left the villa in December 2012 after Plaintiff told him that he was not allowed to leave the villa unless Defendant paid Plaintiff $4 million. [*Id*. at 114]. After 10 days of remaining at the villa, Naugher ultimately left. [*Id*. at 114-15]. When leaving, Jawid Koshani told Naugher he could not leave, and Naugher responded, "shoot me or get out of the way." [*Id*. at 115]. When he left, all Naugher was able to take with him was a backpack. [*Id*.]. On voir dire cross-examination, Naugher stated that the reason he moved out of the villa was that he was told he could not leave, and everyone else moved out of the villa for the same reason. [*Id*. at 116].

After hearing this testimony, the Court asked defense counsel to explain the relevance of the proffered testimony. [*Id*. at 116-17]. Defense counsel then asserted that this evidence related to the abrupt ending of the relationship between the Plaintiff and the Defendant. [*Id*. at 117]. Counsel argued that it was relevant to issues about the termination of the contract, the first to breach the contract, the term of the contract, and when a period of damages should be determined. [*Id*.]. Plaintiff's counsel responded that the jury had heard that there was a breakup of the relationship between the parties, and that was the reason for the separation. [*Id*. at 117-18]. Counsel contended that the allegations of threats were irrelevant, and merely an attempt to prejudice Plaintiff. [*Id*. at 118]. Defense counsel responded that the contract included a duty to act in good faith and fair dealing, and contended that the allegations were relevant to this issue as well. [*Id*. at 119]. The Court concluded that the jury could determine from the evidence already presented that there was an abrupt termination of the working relationship between Plaintiff and Defendant, and the proffered testimony did nothing but inflame the jurors and prejudice Plaintiff. [*Id*.]. The

Court thus concluded that, because there was minimal relevance and the evidence was unduly prejudicial, it would not be admitted. [*Id*. at 119-20].

Defense counsel then proffered additional testimony for the record. [*Id*. at 120]. Naugher testified that he had spoken to Jawid Koshani about payments that the Koshanis believed Defendant owed them, and Jawid told Naugher that if the family did not get their money back, the next time he saw Defendant, he would "blow his brains out." [*Id*. at 120-21]. Naugher stated that Jawid regularly carried a firearm, and had also been blacklisted from U.S. military bases. [*Id*. at 121-22]. After proffering this testimony, defense counsel argued that this testimony would additionally be relevant for purposes of impeaching Jawid's testimony. [*Id*. at 123]. Plaintiff's counsel responded that an alleged threat to "blow someone's brains out" was irrelevant to the terms of the PSA. [*Id*. at 124]. Defense counsel replied that Jawid testified under oath that Americans were falsely accusing Afghanistan nationals of threatening them, and this was evidence that Jawid lied under oath. [*Id*.].

Under Rule 402 of the Federal Rules of Evidence, relevant evidence is generally admissible, and irrelevant evidence is not admissible. Fed. R. Evid. 402. The rules define "relevant evidence" as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401. However, the Court may exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Unfair prejudice" means an undue tendency to suggest decision on an improper

basis, often, but not necessarily, an emotional one.  *United States v. Whittington*, 455 F.3d

736, 739 (6th Cir. 2006) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

"In performing the 403 balancing, the court should give the evidence its maximum

reasonable probative force and its minimum reasonable prejudicial value."  *Donathan v.*

*Orthopaedic & Sports Medicine Clinic, PLLC*, No. 4:07-cv-18, 2009 WL 3584263, at *2

(E.D. Tenn. Oct. 26, 2009) (quoting *Deters v. Equifax Credit Info. Serv.*, 202 F.3d 1262,

1274 (10th Cir. 2000)) (internal quotation marks omitted).

      In light of Rule 403's balancing test, the Court is not convinced that any evidentiary

error occurred in excluding Naugher's testimony relating to either the threats made by

Jawid, or his being held in the villa against his will.  Each of these portions of Naugher's

testimony were irrelevant to the underlying issues in this case, which included whether

Defendant breached the PSA by failing to share profits, and whether Plaintiff: (a) breached

the JVA by not allowing Vanquish Afghanistan to perform any trucking missions as a

subcontractor under the NAT contract; (b) breached the duty of good faith and fair dealing

implicit in the JVA by making false statements to government officials in an attempt to

steal the NAT contract or block payment to Vanquish United States; or (c) induced his

brother Jawid to breach the NDA, by assisting in his attempts to steal the NAT contract.

Naugher's testimony regarding Jawid's alleged threats and being held hostage in the villa

is simply irrelevant to any of these issues being submitted to the jury.  Instead, the only

potential purpose for the introduction of this testimony was to impeach Jawid.  However,

such testimony would have been highly prejudicial to Plaintiff, and likely would have

unfairly inflamed the jury. Accordingly, the testimony was properly excluded under Rule 403.

However, even if the Court should have allowed the testimony at trial, the exclusion was harmless, because, as discussed above, the evidence was not relevant to the questions to be decided by the jury, and the Court can conclude, with fair assurance, that the judgment was not substantially swayed by any error. Moreover, as to the alleged kidnapping, the jury ultimately heard evidence that a dispute between Defendant and Plaintiff led to Vanquish United States leaving the villa in 2012. This, combined with counsel's arguments, was sufficient to allow the jury to fully consider whether the parties' relationship had terminated by that date, and whether such a breakdown in the relationship terminated Defendant's obligations under the PSA. The jury rejected this argument, and such was a reasonable determination on the part of the jury, which the Court will not disturb. For these reasons, the Court will **DENY** Defendant's motion for a new trial on this ground.

### 5. Surprise Testimony

Next, Defendant contends that the Court should order a new trial as a result of Jawid Koshani's surprise or "false" testimony. [Doc. 266 at 22]. Specifically, Defendant states that he was unaware of Jawid's potential testimony that he overheard Defendant telling another individual that the PSA was "just a piece of paper." [*Id*.]. Defendant states that Plaintiff's response to discovery requests did not even list Jawid as a witness, and did not indicate that Jawid overheard any statements. [*Id*. at 22-23].

Plaintiff responds that Jawid's testimony is not a basis for a new trial. [Doc. 294 at 20]. Plaintiff states that Rule 26(e) only requires formal supplementation of an interrogatory response if the additional or corrective information has not otherwise been made known to the other party. [*Id*.]. However, Defendant deposed Jawid, and therefore, it is his own fault if he did not elicit the relevant testimony. [*Id*. at 21]. Moreover, Plaintiff contends that counsel described this testimony in his opening statement, so Defendant should not have been surprised. Additionally, Defendant never objected to this testimony at trial. [*Id*.]. Finally, Plaintiff argues that there is no prejudice because exclusion of this evidence would not have produced a different result. [*Id*. at 21-22].

At trial, Jawid testified that, not long after the PSA was signed, he overheard a conversation between Defendant and Cody Schlomer, Defendant's father-in-law and program manager for the NAT contract, about the PSA. [Doc. 283 at 138]. Jawid stated that this occurred in the evening, probably after dinner. [*Id*.]. Defendant and Mr. Schlomer were having a conversation near Mr. Schlomer's office balcony. [*Id*. at 139]. Jawid testified that he heard Defendant tell Mr. Schlomer that the PSA was "only a piece of paper." [*Id*.]. Jawid stated that he believed this to mean that the PSA meant nothing to Defendant. [*Id*. at 139-40]. After hearing this, Jawid stated that he was concerned abut whether Defendant was going to comply with the PSA. [*Id*. at 140].

The Sixth Circuit has held that a new trial should not be granted on grounds not called to the court's attention during trial "unless the error was so fundamental that gross injustice would result." *United States v. Walton*, 909 F.2d 915, 924 (6th Cir. 1990) (quoting C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2805 (1973)). The party

seeking a new trial bears the burden of showing that he properly preserved issues raised in the motion for a new trial with contemporaneous objections at trial. *K.C. ex rel. Calaway v. Schucker*, No. 02-2715-STA-cgc, 2013 WL 5972192, at *4 (W.D. Tenn. Nov. 8, 2013). A party's failure to object at trial to the testimony of a witness amounts to a waiver of such objection. *Id.*

In the instant case, at no point during the trial of this matter did Defendant raise any objection to Jawid's testimony that he overheard a conversation between Defendant and Schlomer. Indeed, the instant motion for a new trial is the first the Court has heard of this issue. Notably, the Court simply could not have erred in allowing such testimony, because no objection to the testimony was raised, and the Court could not have known whether or not Defendant had been made aware of such testimony, absent an objection. Because Defendant failed to make a contemporaneous objection to the introduction of Jawid's testimony regarding the overheard conversation, he has waived this argument for purposes of his motion for a new trial. Accordingly, the Court will **DENY** Defendant's motion for a new trial on this ground.

### 6. Counterclaims Barred by Statute of Limitations

Defendant then argues that the counterclaims were not barred by the statute of limitations. [Doc. 266 at 23]. Defendant reiterates his argument that the counterclaims were timely filed under the Tennessee suspension statute. [*Id.*]. Defendant contends that this Court misapplied Tennessee precedent, because the only means for service on Plaintiff while he resided in Afghanistan did not include provisions for personal jurisdiction. [*Id.* at 23-24].

Plaintiff responds that Defendant's counterclaims are barred by the statute of limitations. [Doc. 294 at 22]. Plaintiff states that Rules 4A and 4B of the Tennessee Rules of Civil Procedure and Rule 4(f) of the Federal Rules of Civil Procedure provided multiple ways for Defendant to serve Plaintiff, making the Tennessee suspension statute inapplicable. [*Id.*]. Plaintiff further states that Defendant has cited no authority for his attempted distinction of the *Arrowood*[2] rule, and there is no distinction, because this matter has nothing to do with issues of personal jurisdiction. [*Id.* at 23].

Plaintiff raised the argument that the counterclaims were barred by the applicable statutes of limitations in his motion for summary judgment. [Doc. 203]. The Court ultimately agreed that Counterclaims 4, 5, and 7 were barred by the statute of limitations, but concluded that the remaining challenged counterclaims were not barred by the statute of limitations. [Doc. 213]. As to Counterclaims 4, 5, and 7, the Court concluded that, by at least November 2012, Defendant was aware of the basis for these counterclaims. [*Id.* at 12]. The Court relied on emails in which Defendant specifically alleged that Plaintiff was "interfering with [his] contract[.]" [*Id.*]. Thus, the Court concluded that Defendant had three years from November 2012 to file these claims, but waited until August 2017 and July 2018 to file such claims. [*Id.* at 13]. Accordingly, these claims were barred by the statute of limitations. [*Id.*]. The Court also rejected Defendant's contention that the statute of limitations was tolled for these counterclaims based on the Tennessee suspension statute, Tenn. Code Ann. § 28-1-111. [*Id.* at 14-16]. Relying on *Arrowood*, the Court concluded

---

[2] *Arrowood v. McMinn Cnty.*, 121 S.W.2d 566, 567 (Tenn. 1938).

that the suspension statute does not apply unless a person's absence from the state prevents service of process, and found that there were numerous ways under the Tennessee Rules of Civil Procedure that Defendant could have served Plaintiff, even while Plaintiff was residing in Afghanistan. [*Id*. at 15-16].

At the close of evidence at trial, Plaintiff again raised the argument that Defendant's remaining counterclaims, namely, the claims for breach of contract, breach of the duty of good faith and fair dealing, and inducement of a breach of contract ,were barred by the statute of limitations. [Doc. 286 at 214-19]. The Court ultimately agreed that Counterclaims 1 (breach of contract) and 2 (breach of the duty of good faith and fair dealing) were barred by the statute of limitations, based on the evidence presented at trial. [Doc. 243]. As to Counterclaim 1, the Court noted that Defendant testified that he knew that Vanquish Afghanistan would not be performing trucking missions under the NAT contract, and instead was giving every trucking mission to USC, by at least January 2012. [*Id*. at 1]. Nevertheless, Defendant did not raise this claim until July 18, 2018, well after the six-year statute of limitations expired. The Court noted that Defendant again asserted that the suspension statute applied to save this claim, but rejected that argument for the same reasons discussed in the prior summary judgment order. [*Id*.]. The Court further concluded that, because Counterclaim 1 was barred by the statute of limitations, the Court was required to grant judgment as a matter of law on Counterclaim 2, because a claim for breach of the implied covenant of good faith and fair dealing is not a stand alone claim under Tennessee law, but rather, is part of an overall breach of contract claim. [*Id*. at 2].

As to Counterclaim 6, the Court did not address the statute of limitations issue, but rather, granted judgment as a matter of law on other grounds. [*Id.*].

Tennessee generally applies a six-year statute of limitations to contract actions. Tenn. Code. Ann. § 28-3-109(a)(3); *Benz-Elliot v. Barrett Enterprises, LP*, 456 S.W.3d 140, 152 (Tenn. 2015). Tennessee also applies a three-year statute of limitations to tort actions involving injuries to personal or real property. Tenn. Code. Ann. § 28-3-105. A claim for interference with contract falls under this three-year limitations period. *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31, n.1 (Tenn. 2007). The parties do not contest that these are the applicable statutes of limitations for the counterclaims at issue. Under the "discovery rule," a statute of limitations begins to run from the time that "a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof." *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) (citation omitted). Here, the parties did not appear to contest the Court's finding that Defendant's counterclaims were filed outside the applicable statutes of limitations, based on the discovery rule. Rather, Defendant contends that the statutes of limitations were tolled pursuant to the Tennessee suspension statute.

Tennessee law provides that:

If at any time any cause of action shall accrue against any person who shall be out of this state, the action may be commenced within the time limited therefor, after such person shall have come into the state; and, after any cause of action shall have accrued, if the person against whom it has accrued shall be absent from or reside out of the state, the time of absence or residence out of the state shall not be taken as any part of the time limited for the commencement of the action.

Tenn. Code. Ann. § 28-1-111. Tennessee courts have labeled the rule of this so-called "suspension statute," as a "rule of common sense," stating that the running of the statute of limitations "is suspended during any period wherein the claimant is actually and substantially deprived of his opportunity of enforcing his claim because of the absence of the defendant from the State." *Stockburger v. Ray*, 488 S.W. 2d 378, 382 (Tenn. Ct. App. 1972). Thus, this rule is to be applied based on the particular facts of each case. *Id*. Moreover, although the defendant bears the burden of proof to show that a claim is barred by the statute of limitations, once such a showing is made, the burden shifts to the other party to show that an exception applies. *Id*.

The Tennessee Supreme Court has held that "when the remedy of the suitor is complete and unaffected by the absence of the defendant, when his non-residence does not affect the right to sue, [the statute] providing that 'the time of his absence or residence out of the state shall not be taken as any part of the time limited for commencement of the action' is without application." *Arrowood v. McMinn Cnty.*, 121 S.W.2d 566, 567 (Tenn. 1938). The *Arrowood* Court noted that it had previously stated that "[t]he exception made in this statute does not apply to a natural person unless his absence from the state is such as to prevent service of process[,]" and "[a]bsence from the state and residence out of the state, in the sense of the statute, means such absence and such non-residence as renders it impracticable at all times to obtain service of process[.]" *Id*. at 568 (quoting *Turcott v. Yazoo & M.V.R. Co.*, 45 S.W. 1067, 1068-69 (Tenn. 1898)). Thus, the Court concluded that, because there was an available means of serving the defendant, the suspension statute was inapplicable. *Id*. at 569.

The *Arrowood* rule was formulated to limit the application of the suspension statute to situations where it was truly necessary. *Lam v. Smith*, 891 S.W.2d 207, 212 (Tenn. 1994). The rule "is intended to prevent a plaintiff from using the suspension statute to toll indefinitely the limitations period while disregarding valid available methods of serving a nonresident defendant" and "essentially punishes the plaintiff for failing to take advantage of available methods of service." *Id*. The question in determining whether the suspension statute applies is whether the plaintiff has unjustifiably failed to use an available method of service. *Id*. Accordingly, the *Lam* Court held that the proper question in deciding whether the *Arrowood* rule applies is not whether a method of service was available, in the abstract, but "whether the plaintiff has unjustifiably failed to use that method of service under the circumstances of the case." *Id*. Accordingly, the Court concluded that a plaintiff may only rely on the suspension statute if the failure to utilize an available method of service is justified under the circumstances of the case, in other words, if plaintiff has used due diligence to ascertain the defendant's location, he may rely on the suspension statute. *Id*. In a more recent decision, the Tennessee Court of Appeals reiterated the holdings of *Arrowood* and *Lam*, and determined that the suspension statute did not apply when plaintiffs did not exercise due diligence in ascertaining the defendant's address. *Jones v. Johnson*, 244 S.W. 3d 338, 342-43 (Tenn. Ct. App. 2007).

As this Court previously noted, Tennessee Rule of Civil Procedure 4A provides several options for service upon a defendant in a foreign country. Tenn. R. Civ. P. 4A. Specifically, the rule allows for service: (1) by any internationally agreed means reasonably calculated to give notice; (2) in the manner prescribed by the law of the foreign country;

(3) as directed by the foreign authority in response to a letter rogatory or letter of request; (4) delivery to the individual personally a copy of the summons and the complaint; (5) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party served; or (6) other means not prohibited by international agreement as may be directed by the court. *Id*.

The Tennessee suspension statute is plainly inapplicable under the current facts. The Tennessee Rules of Civil Procedure provide a plethora of ways that Defendant could have served a complaint upon Plaintiff, even while Plaintiff was residing in a foreign country. Notably, the rule allows service through delivery of a copy of the summons and complaint to the individual personally. Given the scenario here, there is no clear reason why Defendant could not have had Plaintiff personally served with a summons and complaint. Moreover, there is no evidence that Defendant ever contacted the Afghanistan government to inquire about serving Plaintiff in Afghanistan, nor did Defendant ever file any requests regarding such in this Court. Instead, Defendant merely waited until Plaintiff had filed suit against him to formulate and file his counterclaims against Plaintiff. Because there was an available method of serving Plaintiff, even while he resided in Afghanistan, the *Arrowood* rule applies. Moreover, Defendant has never alleged that he was unaware of Plaintiff's place of residence in Afghanistan, such that the *Lam* exception to the *Arrowood* rule would even come into play. Nevertheless, if the *Lam* exception could apply, Defendant has not met his burden of showing that he acted with due diligence in locating Plaintiff, and therefore, he is not protected by the Tennessee suspension statute. *See Lam*, 891 S.W.2d at 212.

At this stage, Defendant does not appear to contest that there were valid methods of serving Plaintiff in Afghanistan, but rather, contends that *Arrowood* does not apply because the available means for service of process on Plaintiff while he was residing in Afghanistan did not include any provisions for personal jurisdiction. However, nothing in *Arrowood* or its progeny speaks to the matter of personal jurisdiction. Defendant specifically relies on the quote from *Arrowood* that the Tennessee non-resident motorist substitute service of process statute had "the force and validity of personal service on the non-resident as if he was in the jurisdiction of the state and county of action." [Doc. 266 at 23]. But this quotation does not create an additional requirement in the legal principle announced by the case. Rather, the quotation cited is merely the Court's explanation of how a valid method of service was available in that specific scenario, and thus, the suspension clause did not apply to the facts of that case. Moreover, more recent cases have continued to announce the *Arrowood* rule, without including any requirement regarding personal jurisdiction. Ultimately, available means for serving Plaintiff while in Afghanistan were available, but Defendant never explored those options, and so, did not act with due diligence in pursuing his claims. For this reason, the Court concludes that the Tennessee suspension statute does not toll the statute of limitations on Defendant's counterclaims, and the Court will **DENY** the motion for a new trial on this ground.

### 7. Evidence to Support Counterclaim 6

Finally, Defendant contends that there was sufficient evidence to support Counterclaim 6. [Doc. 266 at 24]. Specifically, Defendant states that there was evidence that Plaintiff was involved in Vanquish United States' hiring, and Jawid was hired,

therefore, it was permissible for the jury to infer that Jawid communicated the terms of his employment arrangement to Plaintiff. Defendant also contends that there was circumstantial evidence to conclude that Plaintiff acted maliciously with intent to cause a breach. Further, Defendant argues that there was evidence sufficient to prove damages through the expert witness's opinion and the employment contract. [*Id*.].

Plaintiff responds that the Court correctly granted judgment as a matter of law on Counterclaim 6. [Doc. 294 at 24]. Plaintiff states that the mere fact that Plaintiff was involved in Vanquish United States' hiring is insufficient to support a conclusion that he knew all the terms of Jawid's employment. Moreover, as to intent, Plaintiff contends that, even accepting Defendant's characterization of Plaintiff's actions as an attempt to steal the NAT contract, this could, at most, be evidence of a breach by Jawid, but says nothing about Plaintiff's intent regarding the breach. [*Id*.].

At trial, after the close of all evidence, Plaintiff asserted that the Court should grant judgment as a matter of law on Defendant's counterclaim for inducement of a breach of contract (Counterclaim 6). [Doc. 286 at 219]. Plaintiff contended that there was no evidence that he specifically intended to cause Jawid to breach the non-disclosure agreement, that he acted with malice, or any evidence of damages. [*Id*.]. The Court agreed and granted judgment as a matter of law on Counterclaim 6. [Doc. 243 at 2]. The Court concluded that Vanquish United States presented no evidence, much less clear and convincing evidence, as required under Tenn. Code Ann. § 47-50-109, to support a showing of many of the elements of this claim, including that Plaintiff knew of the contract,

intended that the contract be breached, acted maliciously, or that Vanquish United States suffered damages as a result. [*Id*.].

A claim under Tenn. Code Ann. § 47-50-109 requires a showing of the same elements as the tort of procurement of a breach of contract, namely, the following: (1) there must be a legal contract; (2) the wrongdoer must have knowledge of the existence of the contract; (3) there must be an intention to induce its breach; (4) the wrongdoer must have acted maliciously; (5) there must be a breach of the contract; (6) the act complained of must be the proximate cause of the breach of the contract; and (7) there must have been damages resulting from the breach of the contract. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999). However, for a claim under Tenn. Code Ann. § 47-50-109, the plaintiff must prove each of these elements by clear and convincing evidence, rather than a preponderance of the evidence, as required for the tort of procurement of a breach of contract.

*Id*. at 359-60.

Defendant contends that the jury could conclude that each of the elements of a claim under Tenn. Code Ann. § 47-50-109 had been established. For example, Defendant contends that Plaintiff was involved in Vanquish United States' hiring, and such evidence was sufficient for the jury to infer that he knew of the NDA between Vanquish United States and Jawid. However, there was no direct evidence that Plaintiff knew of the NDA, and the jury would have to do more than infer, and instead, clearly speculate, to reach such a conclusion. Moreover, although Defendant relies on his allegations that Plaintiff attempted to steal the NAT contract as evidence that Plaintiff acted maliciously and with

intent, even assuming that such allegation was true, it does not indicate any specific intent to cause Jawid to breach the NDA. There was simply insufficient evidence presented at trial for a reasonable jury to conclude that Plaintiff was liable for inducement of a breach of contract under Tenn. Code Ann. § 47-50-109, particularly in light of the heightened burden of proof for this claim. Accordingly, the Court will **DENY** Defendant's motion for a new trial on this ground.

### 8. Conclusion

For the reasons stated above, Defendant's renewed motion for judgment as a matter of law, or for a new trial [doc. 265] will be **DENIED**. An order consistent with this opinion will follow.

                                    _____s/ Thomas W. Phillips_____
                                    SENIOR UNITED STATES DISTRICT JUDGE